On the trial the jury found a general verdict of guilty against both the defendants, and a motion was made for a new trial, on two grounds:
1. For misdirection of the judge in his charge to the jury.
The evidence was as follows: Jeremiah Deans, who was the principal witness on behalf of the State, stated that he left Waynesborough on 13 March, 1816, to go to George Deans.' When he got to Dr. Brownrigg's gate, in said town, he met Barna Jernagan, one of the defendants, who took him aside and asked him when he was going to the State of South Carolina (or to the southward) with negroes. Defendant informed Deans he had five or six negroes lying out, that did not belong to him, who wished to be carried away, and he wished Deans to assist him in conveying them away. Defendant asked Deans the consequence of doing *Page 360 
this act. Deans informed him he did not know, but expected it would go hard with him. Deans then left him and went on, and informed George Deans of the conversation. On 18 March he was coming to Waynesborough, and met the other defendant, Lovet Jernagan, who informed him Barna wished to see him, and desired Deans to go to his house. Deans went to Barna's house, when Barna told him three of the negroes were out, viz., Amos, his wife, and youngest child, and the other three he could get out at any time. Defendant Barna informed him the negroes were John Coor Pender's. Deans and Barna agreed to meet at a sale which was to take place at Dinkin's on 20 March. He met Barna at the sale, when Barna informed him three of the negroes were not out. They then agreed to meet at Waynesborough 22 March, when Barna was to let him know when the negroes would be (485) ready to start. On that day Barna did not come, but the other defendant (Lovet) came, and informed Deans that he was to go with Deans and the negroes to the south. Witness informed Lovet that he must see Barna before he started, and sent word by Lovet that Barna must meet him at McKinne's mill. Barna met him, and then informed him all the negroes were out. They then agreed that the negroes were to be sold, and the money to be divided equally between Deans, Lovet, and Barna. He promised to deliver the negroes at a mill-stream of Mrs. Boon's, in the county of Johnston, on the night of 24 March, when Deans was to be ready to receive them, and, with Lovet, to take the negroes to the southward. Deans asked him for a bill of sale. He agreed to give one. Deans wrote it, and was requested by Barna to insert other than the true names of the negroes, as he expected they would be advertised. After the bill of sale was written, Barna refused to sign it, but said he would prepare one and bring it with him when he delivered the negroes. Deans informed Pender of the whole transaction, who advised Deans to go on in the business. Deans and Pender had men placed at Smithfield bridge to apprehend the negroes and Lovet, one of the defendants. Deans went to the mill-stream on the night of the 24th, as agreed on. About 10 o'clock at night Barna and Lovet came to him and informed him the negroes had taken a scare, expecting a trick, and would not go unless Deans would assure them that they were really going to the southward, and he must go back with them along the road where they were. Deans then went back from three to five miles with defendants, to a place (which was proven to be in the county of Wayne, 12 or 15 miles from defendant's house, when Barna called, "Bush!" No answer was given. Barna then rode into the woods and returned with the negro man Amos. He (Barna) and Amos again returned into the woods, and brought the woman and children. *Page 361 
Barna put one of the children into the lap of Deans, and Amos, the negro man, put another behind Lovet, on his horse. Deans, Lovet, the negro Amos, and the others, then proceeded on their intended route. After traveling all night, they were taken at daybreak (486) by the men placed at the bridge for that purpose.
It was proven that the negro Amos was the property of Pender, and known to be such by defendant. The negro Amos had been runaway from Pender upwards of nine months, and was out of the actual possession of Pender at the time aforementioned, but in the possession of no other.
The judge, in his charge to the jury, told them if they believed the evidence, every material allegation in the indictment was sufficiently proven. He further told the jury that if they were satisfied from the evidence that Lovet was present, aiding and consenting to the transaction, he was equally guilty with Barna, who was the active person; and it was his opinion the agency Lovet took in the affair, from the time Amos was put into his and Dean's possession in the road to the time they were taken at the bridge, he well knowing Amos to be the slave of Pender, and conveying him on with a view to sell to some person to the southward, was sufficient to convict him under the statute.
2. Because defendants were improperly refused a challenge for cause, made to one of the jurors.
Needham Whitfield was drawn as a juror, and examined as to his competency. He was asked whether he had formed an opinion as to the guilt or innocence of the defendants. He replied, he had formed an opinion. He was then asked if he had expressed that opinion. He replied that he believed he had. He was then asked by the court, to whom he had expressed his opinion. He answered that he could not recollect, but that he believed he had expressed it, but was not certain. He was then asked by the prisoner's counsel where he stayed the preceding night, and whether the case of the prisoners was not the subject of conversation, and whether he had then expressed his opinion. He answered that he stayed at Dr. Brownrigg's; that the case of the prisoners was there the subject of conversation, but that he did not recollect that he then expressed any opinion.
He was challenged by the prisoners for cause, and the (487) challenge overruled by the court. Being tendered to the prisoners, they challenged him peremptorily. They made twenty-eight peremptory challenges.
The motion for a new trial was overruled, and an appeal taken to this Court. *Page 362 
I ought to distrust the correctness of the opinion I am about to deliver, when I perceive that it differs from that of all my brethren in relation to the prisoner Lovet. But as I have examined with attention all the cases cited, and cannot see my way clearly in any other direction, I feel it to be an indispensable duty to pronounce the best results my own understanding will enable me to arrive at. (494) These are, (1) That the evidence against Lovet was too slight and unsatisfactory to authorize his conviction; and that even in a common question of property, a verdict so found ought to have been set aside. (2) That if, upon any view of the testimony, the verdict against Lovet can be sustained, he is nevertheless entitled, under a fair construction of the act under which he is indicted, to the benefit of clergy.
I will give the reasons which have led me to these two conclusions, and will afterwards speak to some minor points in the case.
1. The natural division of the testimony is into those circumstances which took place before Pender had been made acquainted with the transaction, and consented to it, and those which occurred afterwards. If nothing but the latter class had been proved against either of the prisoners, I think they ought both to have been acquitted, on account of the assent of Pender; and I take this opportunity of expressing my entire concurrence with the doctrine laid down in McDaniel's case, Foster, 121. These latter circumstances can only affect the prisoners, by way of evidence, so far as they can be connected with proofs of guilt existing before Pender's consent was given; and I agree, if anything be proved before that time which implicates Lovet in the crime of stealing or seduction, his subsequent conduct of carrying the slaves to Smithfield bridge may properly be connected with such proof. But beyond this point, I do not feel justified in proceeding. If Lovet was not a guilty man before Pender consented to the larceny, I cannot agree that he shall be considered so afterwards.
In considering the testimony, I cautiously abstain from drawing any inferences from the facts stated; that is the province of a jury. I take them nakedly as they are exhibited in the record, which is drawn up with much care.
The first of the defendants who appears in Barna, who told Deans that he had the negroes lying out, and expressed a wish that Deans would assist him in carrying them away. Five days afterwards Deans met Lovet, who merely delivered a message to Deans that Barna (495) wished to see him. *Page 363 
Lovet did not say that he had negroes lying out, or that he knew they were lying out, or that he wanted assistance to carry them to the southward. He did not, in short, utter a single word about negroes.
When, in consequence of this message, Deans went to Barna's house, whom did he see there? Not Lovet, but Barna, who informed him that three of the negroes were out, and the rest he could get out at any time. Upon this occasion Barna agreed to meet the witness at a sale; and when afterwards they met there, Barna informed him that three of the negroes were not out, but he would let him know when they would be ready to start, if he would meet him at Waynesborough on the 22d. Barna did not attend at the day; but Lovet appeared, and for the first time spoke with Deans about the negroes; but did not, in my opinion, say anything which can justly fasten upon him the guilt of stealing, of seduction, or even a knowledge of either. "He was to go with Deans and the negroes to the south," but whether he was about to do right or wrong, whether Barna acquired the negroes feloniously or otherwise, it does not appear that he knew. At this time Deans sent a message by Lovet to Barna, that the latter must meet him at McKinnie's mill. But Deans did not charge Lovet to accompany Barna, nor did he hold with him that sort of free communication and disclosure, that confidential intercourse, which would seem to be natural in a case where Deans believed that Lovet had been privy to the felony, or aided in it. He did not, in short, unbosom himself to him further than he might safely do to a man who was employed to carry negroes to the southward without knowing whether the possession was fair or fraudulent.
But the case states that they met at the mill. I asked, Did Lovet meet? He was not requested to do so by Deans, who expressly said he (Barna) must meet me (not us) at McKinnie's mill. Barna met him (not them) and then they agreed that the negroes were to be sold and divided between the three; and that they were to be delivered at a mill-stream of Mrs. Boon's, on 24 March, when Deans was (496) to receive them and, with Lovet, convey them to the southward.
No construction of this part of the case will warrant the conclusion that Lovet was present at this meeting, or any party to the agreement relative to the sale of the negroes and the division of the money. If I have read the record aright, it states that the defendant, in the singular number, knew the negroes to be Pender's assent or afterwards, it does not specify.
After this period the assent of Pender was given; and as, in my opinion, all the testimony against Lovet before that time is, without *Page 364 
straining or refinement, susceptible of a construction which leaves his guilt unproved, it ought to receive it.
2. The prisoner is indicted under the act of 1779, ch. 7, which makes it a capital felony to steal a slave; and the inquiry I shall now make is, whether, upon the supposition that Lovet was present, aiding and abetting Barna, but not having actually stolen the slave himself, he shall be entitled to the benefit of clergy.
In a question of so much delicacy and importance, connected with the criminal law of the country, and with that part of it, too, which denounces the punishment of death, I know that a judge should take every step with the utmost caution, and advance no principle which he is unable to produce the best authorities in support of; for as his province is jus dicere etnon dare, it is only by an inflexible adherence to what the law has declared, and by reasoning from well established principles, that he can contribute to that harmonious movement of the different powers of government which forms the essence of civil liberty.
In the correctness of the principles which I shall lay down I have the utmost confidence, because they are deprived from the most authoritative sources. My reasoning from them may be erroneous, and on this point I cannot competently judge.
1. That where clergy is taken away from the principal, it is (497) not of course taken away from the accessory, unless he be also included in the words of the statute. 2 Hawk P. C., 342.
2. That where it is only taken away from the person committing the offense, as in the case of stabbing, or committing larceny in a dwelling-house or privately from the person, his aiders and abettors are not excluded. 1 Hale P. C., 329; Foster, 356.
3. But when the benefit of clergy is taken away from the offense (as in case of murder, buggery [burglary], robbery, rape, and burglary), a principal in the second degree, being present, aiding and abetting the crime, is as well excluded from the clergy as he that is principal in the first degree.
The two first principles will, I think, be found to apply to the case under consideration, and to furnish the rule by which it ought to be decided. I have cited the last for the purpose of showing that the act of Assembly under which the prisoners are indicted extends only to the persons committing the offense, and not to the offense itself.
Persons who are present at the commission of a felony, and aid and abet the principal felon, are, at common law, punishable in the same manner with the principal, because they are considered principals in the second degree. But they were formerly considered in the light of accessories; a notion which gradually yielded to considerations of the justice and propriety of bringing them to trial while the fact was recent *Page 365 
and susceptible of proof, instead of waiting for the conviction of the principal. They are therefore considered as principals for many purposes, and especially for all the purposes of punishment, by the common law.
But when statutes began to be passed creating new felonies, or aggravating the punishment of felonies then existing, judges were called upon to pause and reflect, by the rule of law which demands a strict construction of penal statutes. The question was directly put to them, Shall he be condemned to death whose offense is not specifically described in the act, and who is only a principal by a sort of legal fiction, invented for the furtherance of justice, and adopted (498) without any foresight, that the name given to and the character vested in him would subject him to a severer punishment by any law thereafter to be passed?
Let us see how they answer this question in the first case that occurred. The Statute of Eliz. 39, ch. 15, enacts that clergy shall not be allowed to any that feloniously takes away anything in the daytime amounting to the value of 5s. out of any dwelling-house, or outhouse, albeit no person be within or near the same. Evans and Finch were indicted under this statute, and it appeared in evidence that Evans, by a ladder, climbed to the upper part of the window and took out the money, and that Finch stood upon the ladder, in view of Evans, and saw him enter into the chamber, and was assisting and helping him in the robbery, and took part of the money. It was adjudged that Finch should have his clergy, because it was taken away only from the person offending, and not from the offense. Cro. Car., 473.
If in that case Finch had been indicted at common law, he would have been considered a principal in the second degree, and punished in the same manner with Evans; but because the statute did not particularly describe the part he took in the felony, he was entitled to clergy. The statute speaks of a stealing in the house; therefore he that stealeth, or is a party to the stealing, being out of the house, is not ousted of clergy. 1 Hale, 427. It is equally clear that in the construction of law the entry of Evans was the entry of Finch; but because the court were giving a construction to a statute highly penal, they would give it no other than a strict and literal one. Aiders and abettors were neither named nor described in it, and therefore they should not be punished under it.
The construction which has been put upon the statutes of stabbing is much in point to establish the same doctrine. Wherever persons are present, aiding and abetting him who makes the thrust, they shall be entitled to clergy, although if indicted for manslaughter at common law, they would have been principals in it. (499) *Page 366 
All the reasons given in support of these decisions do, in my opinion, apply with the utmost precision to the act of Assembly under which these prisoners are indicted. "Any person or persons who shall hereafter steal, or shall, by violence, seduction, or any other means, take," etc. It does not describe the offense of an aider and abettor, any more than the statutes of Elizabeth, or those of stabbing; it is penal as any other law, and describes an offense part of which was felony at common law; it takes away the benefit of clergy from the offender, and not from the offense, and bears a near resemblance to the statute on which Innis was indicted. Leech, 9. For that was made to punish stealing in a particular manner, viz.,privately from the person, and it takes away clergy from those who arefound guilty of the offense. So the act of Assembly under consideration designed not merely to increase the punishment of stealing a slave, which was a felony at common law, but it extended beyond this, and punished with death other modes of taking away slaves, which, in my opinion, were not felonies at common law; for a taking by violence does not necessarily imply a felonious taking, unless it be violence to the person of the owner; nor would taking a slave upon a claim of right amount to felony; for if there was any fair pretense of property in the prisoner, or it be brought into doubt at all, the court will direct an acquittal. 2 East, 659.
The occasion of passing this act of Assembly is mentioned by an eminent judge who was in active life at that period, and it appears from thence that it was intended to repress a variety of new modes of taking slaves, which had grown out of the turbulence of the times, "under pretense that they belonged to the public as confiscated, or that they were owned by disaffected persons, or the like." S. v. Hall (799), 1 N.C. From these considerations, I think it appears, without any strained inference or forced construction, that part of the object of the act of Assembly was to take away clergy from larcenies of slaves under particular circumstances; and if so, it comes within the reason of (500) all the cases where clergy has been allowed to aiders and abettors when not named in a penal statute. 2 East, 743.
3. On the last position I have laid down it is unnecessary to make many remarks, because if anything is proved by what I have before said, it is that the act of Assembly does not take away clergy from the offense, but from the offender. The statutes which oust clergy in murder, robbery, etc., have received a different construction, because the Legislature made use of terms which at the time of making the acts and long before were well known to include aiders and abettors. The offenses called murder, robbery,burglary, etc., are technically so described, and aiders and abettors were liable, when the statutes were *Page 367 
passed, to be convicted as principals in them. But taking a slave by "violence, seduction, or any other means," etc., was not a technical description of any offense known before the passing of the act; and, therefore, he alone who takes or seduces, not he who aids and abets, is liable to the punishment of death under it.
The charge of the judge has been objected to because it used the words present, aiding, and consenting; and it has been intimated that the jury might have been misled by that circumstance. I do not think the charge exceptionable in that respect; though I admit it is always most safe to employ the established terms of the law, to which the wisdom of ages has given sanction and usage a popular and explicit meaning. We are not, however, to be governed by the sound words, but by their true legal import. In drawing indictments upon penal statutes, in which the law particularly requires strictness, it is not essential to follow the very words of the statute, provided words of equivalent import are used. To consent signifies "to cooperate to the same end" (Johns. Dict.), and a person who does so, and is also present and aiding, could not well be injured by the language used by the judge. Lord Coke, in commenting on the statute West., 1, in explaining the words commandment
and aid, as applied to accessories before the fact, says: "Under this word command are understood all those who incite, procure, set on, or stir up any other to do the facts; and under the word aid
are comprehended all persons counseling, abetting, plotting, (501) assenting, consenting, and encouraging to do the act, and not present when the act is done." So that a person who consents, though not present, is an aider; "for, if the person be present when the act is done, then he is a principal." Lord Hale says imprison of felony is the concealment of a felony which a man knows, but never consented to; for if he consented, he is either principal or accessory. These authorities show that persons consenting, procuring, or contriving come within the words aid
and command; and to command is not less strong than to abet.