CHAUNCEY BROWN, *Appellee and Complainant,*

*vs.* -

ROSALINE PECK and ABRAHAM WOOD, *Appellants and Defendants.*

| 2 | 261 |
|---|---|
| 83 | 388 |
| 2 | 261 |
| 88 | 203 |
| d88 | 206 |
| 2 | 261 |
| f105 | 281 |

APPEAL IN EQUITY, FROM THE SAUK COUNTY CIRCUIT COURT.

A deed made under duress, will be set aside and held for nought, by a court of equity.

- A purchaser of lands of the person holding, to whom they were conveyed by deed executed under duress, with notice, is not protected as a *bona fide* purchaser.

This was an appeal in equity from the Circuit Court of Sauk county. The complainant's bill sets forth, that in the month of May, 1847, he, the complainant, purchased from the United States a certain tract of land, situate in the county of Sauk, and received from e register of the land office at Mineral Point, a duplicate therefor. Which tract is described as the east half of the southeast quarter of sec. 36, town 12, N. of range 6 east.

That after he had purchased the said land, and in the month of November, 1847, and in the night of the 23d of that month, he, the complainant, was in bed in the tavern house of one Marcus Warren, in Prairie du Sac, Sauk county, and was forcibly seized therein, and dragged out of his bed in said house, into the street, by a multitude of persons, to the number of twenty or more.

That as he is informed and believes, and charges the fact to be, among the number of persons present at

Dec. Term 1853.

Brown
vs.
Peck and
Wood.

that time and place, were Luther Peck, James Christy, James H. Haines, John Crawford, William Canfield, Thomas Remington, Westley Clement; that the said persons, their associates and confederates, illegally, and with force, and menaces of bodily injury, after having dragged him, the said complainant, from the said house, where he was in bed, compelled him to go the village of Prairie du Sac, in said county, and there to execute a deed of conveyance of the said premises, which was witnessed by two witnesses, viz: John B. Crawford and Cyrus Leland, and acknowledged before the said Leland, acting as a notary public, and bearing date the 23d day of November, 1847; by which deed the complainant was compelled to acknowledge the receipt of $100, in payment of the land before described, from one Rosaline Peck, the grantee in said deed, and who, previous to the purchase, pretended to have a "claim" thereon, and to have made certain improvements thereon; but that the said Rosaline had no title to any part thereof, of any description, previous to the purchase of the complainant from the United States.

The bill furhter states and charges, that the individuals before named, and their associates and confederates, acted as the friends and agents of the said Rosaline, either by her express procurement, or with her knowledge, assent and approval; that the said persons on the night aforesaid, as the complainant believes, left with the said Leland, the sum of $100, furnished by the said Rosaline to them, for the purpose of paying the complainant, the amount, as they alleged, of his purchase money for the premises, but that the complainant has never received the same, or any part thereof; that the said deed, so executed by the

Dec. Term
1853.

Brown
vs.
Peck and
Wood.

complainant, was recorded in the office of the register of deeds.

The complainant further states, that the said deed of conveynnce was altogether and entirely involuntary on his part, and that he should not have executed the same unless compelled and forced so to do by maltreatment, menaces of bodily injury, and force of the several persons aforesaid.

That he had good reason to believe and fear, that unless he complied with the request of said persons, by conveying the land to the said Rosaline Peck, serious bodily injury would have been inflicted upon him by the said persons.

That on the 27th day of March, 1849, the said Rosaline conveyed the said premises to Abraham Wood for the express consideration of seven hundred dollars, which deed was duly recorded; and on the same day, Wood executed to Rosaline Peck a mortgage on the same premises, to secure the payment of seven hundred dollars, according to the condition of five promissory notes executed by Wood to Peck, which mortgage was also recorded.

That the said Wood well knew the circumstances of force and fraud by which the said Rosaline obtained a deed from complainant; that said Wood was not a bonafide purchaser for a valuable consideration without notice; that the said deed from Peck to Wood, and the mortgage of Wood to Peck, were sham and fraudulent transactions, entered into by the said Peck and Wood for the purpose of injuring the complainant, in establishing his title to the premises; that the said Wood has never paid any thing for said premises, and that the said Peck has ever since remained in the possession and enjoyment of the same.

DEC. TERM
1853.

Brown
vs.
Peck and
Wood.

The bill prays that the deed of the complainant to the said Rosaline, may be decreed to be void and of no effect, and that the said deed of Peck to Wood, and the mortgage of Wood to Peck, may be decreed to be void and of no effect, and may be delivered up to be cancelled, together with a prayer for general relief; also for injunction restraining the defendants from selling or encumbering the said premises.

The defendants answered separately. Rosaline Peck answers and admits that the complainant, in May, 1847, purchased from the United States the premises in question. Admits that she has been informed and believes, that on the 23d of November, 1847, several persons, among whom was Luther Peck, called upon the complainant at Prairie du Sac, for the purpose of seeing him in relation to complainant's business with her in reference to said land; but denies that she knew any thing of the contemplated mob, if any there was.

And on information and belief, denies that the complainant was forcibly seized while in bed in the tavern house of one Marcus Warren, of Prairie du Sac, and dragged into the street by a multitude of persons, on the night of the 23d of November, 1847; and denies that the complainant was illegally, and with force and menaces of bodily injury, compelled to go to the village of Prairie du Sac, to execute a deed of the said premises to the said Rosaline, and to acknowledge the receipt of $100 in payment therefor.

And denies that Luther Peck, Christy, Haines, &c., and their associates mentioned in the bill, acted as her friends and agents, or by her procurement and employment, or with her knowledge or assent; but admits that Luther Peck drew $100, money belonging

to her, from one Johnson, and unbeknown to her, went

and called upon the complainant at the time afore-
said ; which sum of money is the same as that men-
tioned in the complainant's bill, as having been fur-
nished by her to the persons aforesaid ; and otherwise
as above stated, denies having furnished any money
whatever, to the individuals before named.

And denies that the said deed to her, was involun-
tary on the part of complainant, but avers that he
executed the same without being compelled by any
maltreatment, or menaces of bodily injury and force
by the persons before named.

That she recognizes Luther Peck, one of the per-
sons above named, as her agent, for the purpose of
lawfully negotiating with the said complainant, for
the purchase of the said land, and not otherwise.

That the said complainant, on the said 23d day of
November, 1847, freely and voluntarily went before
Cyrus Leland, notary public for said county, and free-
ly made and executed a deed of conveyance of the
said premises to this defendant, and did receive there-
for $100, in full satisfaction thereof.

That for a long time previous to the month of No-
vember, 1847, she was in the possession and occu-
pancy of said premises ; that previous to the entry of
the same by the complainant, she had made and pro-
cured to be made valuable improvements thereon, to
the value of $500, as she believes ; that she had been
in the peaceable and uninterrupted enjoyment of the
premises for a period of nine years ; that she was un-
able to buy the same, when the land came into mar-
ket ; that the said complainant, by his delays in the
premises, has acquiesced in her title, allowing her to
make valuable improvements thereon, and that it is

Dec. Term
1853.

Brown
vs.
Peck and
Wood.

contrary to equity and good conscience for the complainant now to raise any objection to her title.

That the complainant has never paid back or tendered the said sum of $100, so received by him as aforesaid ; that the complainant ought in equity and good conscience, long since to have disaffirmed or revoked his said deed of conveyance, had he intended so to do ; that by neglecting so to do, he has been guilty of laches, and great delay, which tend to the manifest wrong and injury of this defendant ; that her said deed to Abraham Wood, and the mortgage of Wood to her, were bonafide, and not intended to defraud or injure the complainant or any one else.

Abraham Wood answers and says, that after the purchase of said land, in the month of November, 1847, he knows from report only, of a difficulty between the complainant, and Luther Peck and some others, among whom were Christy, Haynes, Crawford, Canfield, Remington and Clement, at the house of Marcus Warren, at Prairie du Sac ; which difficulty he was informed and believed, was in relation to the tract of land in question, but he was informed and believed that said difficulty was amicably arranged at the time.

Denies that complainant was dragged from his bed into the street ; denies all knowledge of threats of bodily injury to the complainant ; denies that any such threats were made.

And the defendant Wood further says, that he is informed and believes, that at the time the complainant executed the deed to Rosaline Peck, he admitted his wrong and injury to her, and her equity in the premises, and in consideration thereof, and of the refunding the purchase money, he made the deed to her ;

that he did not make the same through fear ; that he received the sum of $100, the purchase money afore- said, and did himself place the same in the hands of the said Leland ; that he was not compelled to do the same ; that he in no wise protested against the execution of the deed ; that at the time of his purchase of the premises, he knew nothing of the deeding and conveying of the premises to Mrs. Peck by the complainant, except by report ; that he is a purchaser in good faith for the consideration of seven hundred dollars, to be paid according to the condition of five promissory notes, which are secured by mortgage on the premises ; admits the defendant Peck to have retained the possession ever since his purchase, and insists that the complainant is guilty of laches in the premises :

To these answers there were general replications, and the following is substantially the testimony taken by the parties.

Marcus Warren, on the part of the complainant, testified, that in the fall of 1847 he kept a tavern in the town of Lower Sauk ; that in the fall of 1847, a young man came to his house and called for a bed ; the same evening, or the next day, he learned his name was Brown ; soon after the young man retired, one or two men came into the house and inquired if Mr. Brown was there ; they were answered, he was not; they then said he was there, for they had seen him there. Witness then told them that there was a stranger in the house that had gone to bed ; they wished to see him. Witness showed them to his room, and they said that was the man they wanted to see. Witness then went out, and after he had come down stairs, five, six, or eight, or ten more strangers had come into

Dec. Term
1853.

Brown
vs.
Peck and
Wood.
the bar-room. They talked pretty loud, and witness began to suspect something was wrong; then one of the persons that was up stairs came down, and went back, and several others went up with him. Witness went up also. They wanted the man to get up out of bed, and he would not get up; then witness requested them to leave the room, but they would not go; witness then went down stairs. After a while they brought the man down; he, Brown, had nothing on but his shirt. Witness prevailed on them to let him go back to his room and put on his clothes, and he went back. The next time witness saw him he had his clothes on, and was going out of doors; five or six men had hold of him as they came down stairs and went out. When he came down stairs in his shirt, witness thinks as many as five or six had hold of his arms and legs; they were carrying him down; they wanted him to make a deed of some land to the widow Peck; he kept refusing; they said they would not hurt him if he would make a deed; witness thinks James Christy was one of the party. They took him away from the house by force; he appeared unwilling to go with them; they went up street, in the diretion of Prairie du Sac; they made some threats to him if he did not give the deed, but witness does not recollect what they were; there could not have been less than fifteen or twenty in the party; the weather was cold; thinks it was as late as November; the threats were made by all of them; they were made up stairs; they told him he must get up and go with them. Witness advised them to let this man go along with them; should think five or six had hold of him; cannot say positively at what particular time the conversation took place about

deeding the land to Mrs. Peck, whether at the first, or
second time the party went up stairs.

It was also further proved by quite a number of
witnesses who seemed to be more or less implicated
in the transaction, and whose testimony indicated a
settled purpose to procure the signing and execution
of the deed to Mrs. Peck ; that the defendant was
taken by a number of men, at a late hour in the
night, from his bed, in the tavern house of Marcus
Warren, in Lower Sauk village ; from thence to the
village of Prairie du Sac, some three-fourths of a mile
distant ; that after being taken into the street a few
rods, a motion was made by one of the party to
throw Brown into the river, but it was compromised
by rolling him in the mud ; that on the way, he was
once or twice thrown down in the mud and snow, and
that mud and snow was thrown upon him : that he
was rolled in the mud and snow two or three times ;
that he was taken by the party aforesaid to a house in
Prairie du Sac, where appeared a notary public, with
the deed ready prepared for him to execute ; that the
notary public, Cyrus Leland, was called up to take
the acknowledgment of the deed, by John Crawford,
one of the party, and others with him.  That Mr.
Brown was pointed out to the notary ; that he was
wet, muddy, cold and shivering ; that he made no re-
ply when he was told that the deed was ready ; that
some one of the party laid the money, $100, upon the
table, and asked the notary to count it ; that the no-
tary stated there was $100 : that Brown executed the
deed, but that he did not count the money or touch it
at all ; that the notary asked Brown, if he, the nota-
ry, should keep the money for him until morning ;
that Brown answered, he should.  John Crawford,

one of the party, furnished the notary with a description of the premises ; that no one paid the notary ; that the $100 remained, and still remains, in the notary's hands uncalled for ; that Brown, the complainant, seemed to be agitated, shivered with cold, and spoke with difficulty ; that it was a matter of general notoriety immediately about Sac Prairie, that Mrs. Peck had got a deed, and also the circumstances under which it was executed.

It should be remarked that the witnesses for the complainant seemed to testify with considerable reluctance, but the foregoing is substantially the purport of the testimony taken on behalf of the complainant.

On the part of the defendant, it was proved, that Mr. Peck, the husband of Mrs. Peck, left for Oregon in 1845 ; that he left his family in possession of the premises in question; that the times were very hard when this land, together with others, came into market ; that there were many who had claims, who were unable to purchase land at the government sale ; that probably the improvements were made after the lands were run into townships, but before they were divided by the government survey ; that the amount of improvements put upon the land by Mrs. Peck and her husband were from $300 to $350.

Upon the testimony presented to the Circuit Court, that court made the following decree, the case having been brought to a hearing at the April Term, 1853.

" This cause coming on this day to be heard upon the pleadings filed, and the proofs taken therein, and Mr. William H. Clark, of counsel for complainant, and C. C. Remington, of counsel for defendants, having been heard, it is ordered, adjudged and decreed, that this court, by virtue of the power and authority

therein vested, doth order, adjudge and decree, that a certain deed of conveyance, executed by Chauncey Brown, Jr., the complainant in the above entitled cause, to Rosaline Peck, one of the defendants in said cause, of the east half of the south east quarter of section number thirty-six, in township number twelve north, of range number six east, of the fourth principal meridian, in the State of Wisconsin, and bearing date on the twenty-third of November, one thousand eight hundred and forty-seven, and acknowledged before Cyrus Leland, notary public, and recorded in the office of the register of deeds of Sauk county, in volume A. of deeds, on page 351, is absolutely void, and of no effect in law or equity.

And it is further ordered, adjudged and decreed, that a certain deed of conveyance of the before described land, executed by the said Rosaline Peck to Abraham Wood, another of the said defendants to this bill, bearing date on the twenty-seventh day of March, in the year of our Lord one thousand eight hundred and forty-nine, and acknowledged before one Henry Chapman, notary public, Sauk county, Wisconsin, and recorded in the office of the register of deeds of said county, in volume B. of deeds, on page three hundred and nine, is fraudulent, and is absolutely void and of no effect, either in law or equity.

It is further ordered, adjudged and decreed, that a certain indenture of mortgage, executed by the said Abraham Wood to the said Rosaline Peck, of the premises aforesaid, and bearing date on the day and year last aforesaid, and acknowledged before the said Henry Chapman, as notary public, and recorded in the office of the register of deeds of Sauk county, in volume A. of Mortgages, on pages 334, 335 and 336,

Dᴇᴄ. Tᴇʀᴍ
1853.

Brown
*vs.*
Peck and
Wood.

is fraudulent, and absolutely void, and of no effect in law or equity.

It is further ordered, adjudged and decreed, that a good and valid title both in law and equity, as against the said Rosaline Peck and Abraham Wood, and all persons claiming under them or either of them, of the said before described premises or land, together with all and singular the hereditaments and appurtenances thereunto belonging, or in any wise appertaining, be hereby passed in fee simple to the said Chauncey Brown, Jr., complainant in the above entitled cause and the east half of the southeast quarter of section number thirty-six, in town twelve north, of range number six east, in the State of Wisconsin, and county of Sauk, together with all and singular the hereditaments and appurtenances thereunto belonging, is hereby decreed to the said Chauncey Brown, Jr., his heirs and assigns.

It is further ordered, adjudged and decreed, that the said Rosaline Peck, and all others in possession of the said premises, with the appurtenances, deliver up to the said complainant, Chauncey Brown, Jr.. quiet and peaceable possession of said premises and appurtenances, when thereto requested by said complainant or his agent."·

*Collins & Remington*, for the appellants.

The pleadings in this case show an issue on the allegation of *duress per minas*. The evidence shows not a case of *duress per minas*, but if any duress, that of imprisonment, which is not sufficient for this issue. 9 *Peters*, 405 ; 2 *Sum.* 239 ; 2 *Story's Rep.* 269 ; *Bac. Ab.* 773.

Although the complainant was abused and impris-

oned, the evidence shows that the deed must have been executed as much from a' sense of duty and a consideration in money, as from any other cause. The delay in avoiding the deed is evidence of this.

After a party has elected to consider a voidable deed as binding, he cannot afterwards avoid it.

Brown should have notified Mrs. Peck, within a reasonable time, of his intention to avoid a deed. " He who asks equity, should do equity," and it was at least inequitable in Brown to lie by and see Mrs. Peck occupy and improve the land in question, without setting up any claim.

The sale to Wood was good, if he was an innocent purchaser, and there is no proof to the contrary ; the defect in the deed to Mrs. Peck, if any, on account of duress, was purged. Wood's equity is equal to Brown's. *Fletcher vs. Peck*, 6 *Cranch*, 133 ; *Story's Eq.*, secs. 108–129–155–437 ; 3 *Metcalf*, 338.

*J. H. Knowlton* made the following points to sustain the decree in behalf of the complainant :

1st. That there was no delivery of the deed of the premises conveyed, and consequently said deed is void.

2d. That said deed was void by reason of duress.

3d. That Wood, the co-defendant, does not occupy the attitude of a bonafide purchaser for a valuable consideration.

4th. That the decree herein is in accordance with equity and law, and with the facts developed by the evidence, and should be fully sustained.

An express act of delivery, or words, directions, or acts implying a delivery, are necessary to constitute a valid delivery in law. *Jacobs' Law Dict.* ; *Walker's American Law* ; *Kent's Commentaries*, 499, *4th vol.* ;

S

Dec. Term
1853.

Brown
vs.
Peck and
Wood.

*Greenleaf's Cruise, on Real Property. Title* 32d, *Deed ch.* 2, *sec.* 61, 64, *and notes.*

The 2d point made is, that said deed is void, by reason of duress.

Duress "is an actual, or a threatened violence or restraint of a man's person contrary to law, to compel him to enter into a contract or to discharge one." *Bouvier's Law Dic.*

"The state of compulsion or necessity in which a person is induced, by restraint of his liberty, or menaces of bodily harm, to execute a deed or do any act, or to commit a misdemeanor, may be taken advantage of to avoid its consequence. *Burrill's Law Dict.*

Chancellor Kent, in 2d vol. Com., 7th ed. says :—
"If a contract be entered into by means of violence offered to the will, or under the *influence of undue constraint*, the party may avoid it by the plea of duress, and that it is requisite to the validity of every agreement, that it be the result of a *free* and *bonafide exercise of the will.*

"When a person be under arrest for an unjust cause, but withou lawful authority, he may be considered under *duress*. The general rule is, that either the imprisonment or *duress* must be *tortious* and without lawful authority, or by an abuse of the lawful authority to arrest, to constitute *duress* by *imprisonment.*

"Fear of unlawful imprisonment will constitute a case of *duress par minas.*" *Coke's Littleton*, 253–6 ; 2 *Just's*, 482 ; *Foshay vs. Ferguson*, 5 *Hill*, 154.

In *Richardson vs. Duncan*, 3 *N. H. Rep.* 157, it was held "that though the arrest be for a just cause,

Dec. Term
1853.

Brown
vs.
Peck and
Wood.

and under lawful authority, it may amount to *duress*, if done for unlawful purposes."

Mr. Justice Bronson, in the case of *Forshay vs. Ferguson*, 5 *Hill*, says: "I entertain no doubt that a contract procured by threats and the *fear* of *battery*, or the *destruction* of *property* may be avoided on the ground of *duress*, there is nothing but the form of a contract in such a cause, and it may be avoided."

Courts of equity have frequently held that deeds obtained by means of undue influence, short of force or threats, were void.

Justice Story says, *Eq. Com.* 1 *vol.* 239: "When one is under the influence of extreme terror, or of threats, or of apprehensions short of duress, his acts may be avoided, for in cases of this sort he has no free will, but stands *in vinculis*. And the constant rule is that where a party is not equal to protecting himself, the court will protect him." *Wheelan vs. Wheelan*, 3 *Cowen*; *Huguenin vs. Basely*, 14 *Vesey*, senior; *Nantes vs. Corrack*, 9 *do.*; *Crom vs. Bullad*, 1 *do.*

*By the Court*, SMITH, J. The bill is filed in this case to avoid and set aside a deed of the complainant to the defendant, Rosaline Peck, for a certain tract of land in the county of Sauk, which he alleges was made, executed and acknowledged under duress.

The bill states, that in the month of May, A. D. 1847, the complainant purchased the land in question from the United States, and received the register's duplicate therefor; that in the night of the 23d of November following, while he was in bed at the tavern house of Marcus Warren, in Prairie du Sac, in said county of Sauk, he was forcibly seized therein,

Dec. Term
1853.

Brown
vs.
Peck and
Wood.

and dragged out of his bed, into the street, by some twenty or more persons, among whom were Luther Peck, James Christy, James H. Haines, John Crawford, William Canfield, Thomas Remington, Westley Clement, and others unknown, and by them illegally, by force and the infliction of bodily injury, after having dragged the complainant from his bed, compelled to go to the village of Prairie du Sac, and then, to execute a deed of the said land to the said Rosaline Peck, which was witnessed by John B. Crawford, and Cyrus Leland, notary public, and bore date the said 23d day of November, 1847; and compelled him to acknowledge the receipt of one hundred dollars from the said Rosaline.

The bill further states, that the said persons acted as the friends and agents of the said Rosaline, either by her express procurement previous to, or with her approval afterwards, of their violent and riotous acts; that the said sum of $100 was furnished by her, and was left with Leland, the notary, and that the complainant never received or applied for said money. That the deed was altogether and wholly involuntary, &c.

The testimony taken and produced on the hearing, more than sustains the allegations of the bill, and exhibits a case of the most lawless violence and maltreatment on the part of the persons charged in the bill. The complainant was forcibly and violently taken from his bed, in the midst of the night, with no clothing but his shirt. At the very moment of their attack upon him, the rioters demanded of him to make a deed of the land to the widow Peck; five or six men had hold of his arms and legs. He refused, and continued to refuse to execute the deed. They soon took him from the house by force. It was in cold

weather. He was thrown down and rolled in the
mud and water, and mud and snow was thrown upon
him. After having been a considerable time subject-
ed to such kind of treatment, he promised, if they
would go back, he would give Mrs. Peck a deed. He
was then taken to Fife's tavern, when the notary was
sent for, who came with a deed ready prepared, which
was then and there executed by the complainant.
The hour was somewhat after midnight. The hun-
dred dollars was laid on the table by Luther Peck,
and was taken charge of by the notary. The notary
describes the complainant as " wet, muddy, cold
and shivering ; he seemed to .be agitated, shivered
with cold, and spoke with difficulty ; his face was
muddy." Such is a meagre outline of the evidence
produced on the part of the complainant, drawn from
the actors themselves, and is uncontradicted and un-
mitigated.

" Every legal contract," says Bacon, " must be the
act of the understanding, which they are incapable of
using, who are under restraint and terrors ; and there-
fore the law requires the free assent of the parties as
essential to every contract, and that they be not under
any force or violence. 2 *Bac. Ab. Title* " *Duress*," 402.

It is perfectly apparent to every one, that there
was not that free assent to the mind of the complain-
ant in the execution of the deed in question, which is
essential to a valid contract. To enforce a contract
entered into under circumstances which characterize
the transactions proved in this case, would be to with-
draw the protection of the court from those unable
to protect themselves, and prostitute its sacred func-
tions to the purposes of lawless violence and outrage.

Nor, in a court of equity, is it necessary to observe

Dec. Term
1853.

Brown
vs.
Peck and
Wood.
the technical distinction sometimes taken between *duress per minas*, and duress of *imprisonment*, for whether it be *per minas vitae*, or *per minas imprisonum et cet.*, in equity it is equally fatal to the contract, if the menaces used, or equivalent acts of violence, are such as to have an undue influence upon the party, and to prevent the exercise of his own free will, in executing the contract, it is voidable. The free, voluntary meeting and mingling, or acquiescence of minds, is a *sine qua non* in filling contracts. And " though terror and force are not sufficient to make it duress at common law, yet it may be relieved against in equity. 2 *Vern.* 497.

Without attempting to recapitulate, or to give a further detail of the testimony, it is sufficient to remark, that it is hardly possible to conceive of a case, of a deed extorted by force, menaces and fear, more clearly proved than the one before us. If there ever was an instance in which the party contracting stood *in vinculis*, this is one. We are unable to perceive why the complainant may not reasonably have been in fear for his life. Dragged down from his bed at the dead hour of the night, in cold November, rolled two or three times in the mud and snow, and taken cold, shivering, and scarcely able to speak, before a notary who had the instrument for him to sign ready-prepared to his hand, with a perfect consciousness of a design on the part of his persecutors further to " lynch " him, if he refused to comply with their requests, without a voice raised in his behalf, or an arm uplifted for his protection, the stoutest heart might reasonably quail, and the most stoical be anxious in regard to the result of the purpose then being executed.

Dec. Term
1853.

Brown
*vs.*
Peck and
Wood.

We must confess to our astonishment, that any officer of the State, acting under the solemnity of his official oath, could have taken the acknowledgment of a deed from a person in the condition, and under the circumstances in which he describes the complainant. But we forbear to comment upon the conduct of the notary, any further than simply remarking, that as this is the first, so we think it will be the last instance of the kind, which may ever come to our notice.

But it is claimed here, that the defendant, Mrs. Peck, was ignorant of the designs of the rioters, and that the outrages upon the complainant were not made by her procurement or with her consent. This does not alter the law or the equities between the parties. The object of the rioters was, to procure this deed for the benefit of Mrs. Peck, and under this deed so obtained, she claims. . She does not occupy the position of an innocent purchaser, and hence we are not called upon to decide any question of that kind so far as she is concerned. By taking the deed of the complainant, obtained as that was, she took it subject to all the equities attending its inception and consummation.

It only remains to consider the rights of the defendant Wood; and on this head very little need be said. By the answer of Wood, and the circumstances detailed in evidence, we are relieved from the necessity of ascertaining what would have been his equity, (or whether he would have had any,) had he been an actual *bona fide* purchaser without notice; in the want of the failure of the grantor's title. He has never paid anything for the land, but merely gave his notes, secured by mortgage on the land, payable at a

Dec. Term
1853.

Brown
vs.
Peck and
Wood.

long day, the grantor retaining possession all the while, and characterizing the transaction as "a friendly act" on the part of Mr. Wood. It is also apparent, that he had either actual notice of the circumstances attending the execution of the deed of the complainant to his grantor, or had such notice as should have put him upon inquiry. He lived in the neighborhood at the time of the transaction. It was a subject generally known, talked about and understood, and in his answer he says, "that from her long and uninterrupted possession of the lot, *and from the complainant's long acquiescence* in Mrs. Peck"s title, he did not suspect or imagine that the complainant could or would repudiate or attempt to repudiate his deed to her." Why should he use this language, if he had no knowledge of the circumstances attending the execution of the deed?

We cannot, therefore, regard Mr. Wood as an innocent purchaser, and if he were, we are far from expressing the opinion that his rights would have been different.

It is set up in the answer of both the defendants, that the complainant had received the one hundred dollars, money of Mrs. Peck, at the time he executed the deed, and that the complainant ought to have refunded to her that sum and the interest. The whole of the argument, and the equity urged, is based upon the assumed fact, that the act of Luther Peck, in laying the $100 upon the table of Leland, constituted a payment on behalf of Mrs. Peck, and that the answer of the complainant to Leland's question, if he should keep the money till morning, constituted a receipt of the consideration. But such is not the legal construction of those acts. In no sense

could Leland, brought to Fife's tavern with a deed in his hand, at the instance of the rioters, for the purpose of consummating their object, be considered the agent of the complainant. His acts and language in regard to the disposition of the money, are as void as those of the subscribing and acknowledging the deed. And.the fact, that he not only did not call for the money the next morning, but never applied for it, was a sufficient disclaimer of any assent of his to its disposition, and was quite sufficient to apprise Mrs. Peck and the others, of his intention to avoid his deed. There was in fact no valid, legal payment made, nor any received, but the transactions in all their parts, were illegal, and of course not binding upon any.

Dec. Term 1853.

Brown vs. Peck and Wood.

But it is further urged, that the complainant, by his delay in asserting his rights, has lost them; that by failing to give earlier notice of his intention to repudiate his deed, by the commencement of suit or otherwise, he has ratified and confirmed it. There is no doubt, that by long acquiescence in a contract merely voidable, the right to avoid it may be lost. But in order to charge a person with delay or laches, he must be shown to have been in a condition safely to assert and enforce his rights. This deed was executed on the night of the 23d of November, A. D. 1847, and the bill was filed the 20th of September, A. D. 1850. In the meantime, the same reasons might have deterred him from attempting to avoid his deed, which operated to induce him to execute it. If he could not withhold the deed without being subject to midnight attacks and dangerous assaults, he might well hesitate for a while, about retracting what he had been forced to do. If the feeling of in-

dignation towards him was so rife and so general in that neighborhood, as to lead to such illegal acts and demonstrations, we are far from saying that the complainant did not act wisely in delaying a resort to legal means to compel the cancellation of the deed thus extorted from him.

In commenting upon the facts of this case, we have been compelled to use terms expressive of the just character of the transactions disclosed. It is our duty so to do. Here was a high-handed outrage upon the law, and the rights of a citizen entitled to its protection, and when persons attempt to set themselves above the law, and redress their own grievances in their own way, it becomes the duty of every officer and citizen to rebuke conduct so fatal to all the interterests of society, and so destructive to the administration of justice.

Nor do we intend to justify or palliate the conduct of the complainant, in entering the land of Mrs. Peck, or rather the land on which she lived. The dictates of humanity should have prompted him to seek other fields for speculation or profitable investment. If he entered the land ignorantly, he should have corrected the mistake; if he did it knowingly, he deserved the censure of the generous and humane. But there are many departures from a high standard of moral conduct, which the law cannot punish, but which find their desert before that social tribunal erected by public sentiment in every well regulated community. The complainant had the legal right to enter the land, and if he so used his legal right as to outrage the generous sympathies of the people, he should have been left to that social condemnation which the moral character of his conduct was calculated to in-

spire. But those rights which the law guarantees must be protected, and those who attempt to take the law into their own hands, or to provide for a violent redress of grievances, which the law cannot reach, will only find in the end, that they have inflicted a deep wound upon the source of their own protection and security, without accomplishing, and in nine times out of ten, defeating the very object which they had in view.

We see no error in the decree of the court below, and no reason for disturbing it. The decree of the Circuit Court is affirmed, with costs.