JAMES L. CURRIE v. J. B. CLARK and others.

*Execution—Fraud in suppressing bidding—Setting aside Sale—Judge's Charge must be put in writing at request of party.*

1. At execution sale the defendant's property was bid off by the plaintiff at an inconsiderable sum, in pursuance of an alleged fraudulent arrangement to suppress competition among bidders; *Held*, in an action to impeach the title acquired by plaintiff, that the sale be set aside and the parties placed *in statu quo*, without prejudice to the plaintiff's remedies from lapse of time since the sale.

2. It is the duty of the judge, at the request of a party to an action, to put his instructions in writing and read them to the jury. THE CODE, §414. But where the court, as here, gave oral instructions not differing from those set out in the written charge, and the appellant makes no suggestion to the contrary, his exception to the oral part of the charge does not constitute ground for a new trial.

(*Crews* v. *Bank*, 77 N. C., 110; *Young* v. *Greenlee*, 82 N. C., 346, and 85 N. C., 593, cited and approved).

EJECTMENT tried at Fall Term, 1883, of MOORE Superior Court, before *McKoy, J.*

The plaintiff appealed.

*Messrs. Hinsdale & Devereux* and *W. A. Guthrie*, for plaintiff.
*Messrs. John Manning, M. S. Robins* and *R. P. Buxton*, for defendants.

SMITH, C. J. The plaintiff's title to the land in dispute is derived from a sale under executions issued against the defendants, made on August 7th, 1879, and the sheriff's deed executed on the next day. The answer, after denying the plaintiff's allegation of ownership and wrongful withholding, while admitting possession, sets up a defence to the action that the sale was brought about and the land bid off and conveyed by the sheriff through the fraudulent procurement and unfair practices of the plaintiff, by means whereof he became the purchaser of the property, worth several hundred dollars, for the inconsiderable sum of twenty-five dollars, and thereby acquired no estate in the premises.

Four issues were submitted to the jury, the first three enquiring as to the plaintiff's title, the defendants' wrongful possession and the damages therefrom, and the fourth involving the essential matters of defence, in these words:

4. Did the plaintiff obtain the title through means of the sheriff's sale by fraudulently suppressing the biddings therefor by means of fraud or fraudulent representations, or fraudulent practices?

The jury found all the issues upon the evidence and under the instruction of the court against the plaintiff, and from the judgment rendered thereon he appeals.

The last and material issue is somewhat vague and confused, and does not present the intended enquiry into the plaintiff's conduct, in connection with the sale and the *mala fides* and fraud imputed to him, in a form calculated to be understood and explicitly answered by the jury, and restrictive of the evidence to be heard. But no exception was taken, and the issue seems to have been framed with a view to the admission of impeaching and sustaining testimony in regard to the plaintiff's action in securing the title through a judicial sale by practices not tolerated by the law, and the fruits of which it will not permit him to retain. The evidence upon this point may be thus summarily stated:

There had been several judgments recovered against the defendants, two of them on debts contracted before the adoption of the constitution in 1868, and entitled to priority of satisfaction, and all docketed in the superior court of Moore county, on which executions had been issued to the sheriff, and were in his hands at August term, 1879, of the court.

The first and earliest docketed judgment was in favor of H. and E. J. Lilly, and had been assigned to the plaintiff, and the next, in favor of E. L. Pemberton, was in charge of his attorney, J. C. Black, for management and collection. The amount due on both, with costs, was about seven hundred dollars, which sum, increased by the other executions, made an aggregate of near one thousand dollars, the value of the land upon the estimate of a witness for the plaintiff.

The sheriff with these writs advertised the sale of the land to take place on August 4th, the first day of the term of the court, and while he sold other property under other executions, postponed the sale of this until the next and again the day following, Wednesday, when amid considerable bidding it was sold to the said attorney for the sum of seven hundred dollars, the defendant N. D. J. Clark being present, the sheriff giving notice that if the bid was not complied with the land would be again put up at 10 A. M. of the ensuing day. On Thursday, as the sheriff was proceeding to resell, during the recess between the morning and evening sessions of the court, he was stopped by the plaintiff, who asked him to wait a few moments, during which the plaintiff and the attorney withdrew for private consultation, at the end of which the plaintiff returned and directed the officer, in his own language, to "go ahead." During this interview the plaintiff proposed to buy the Pemberton debt, and was informed by Black that he had assured Clark the day before that the land, if resold, should bring enough to pay that execution; and thereupon the plaintiff said: "If you will let me have the judgment the sale may go over."

Under these circumstances the assignment was made to him

of the Pemberton debt and the sale proceeded, when the plaintiff became the purchaser at the price of twenty-five dollars. Clark was not present on this occasion, nor was the attorney, who testifies he would have been, had he known of it. The testimony of the plaintiff is in opposition to that of Black in reference to any suggestion of deferring the sale and his assent thereto.

It does not appear how many, if any other, persons were present on the occasion of the last sale, or whether any bid except that of the plaintiff was made.

The appellant's exceptions are now to be considered:

1. The defendant, N. D. J. Clark, to whom the land is understood to belong, and who is referred to when the name is used, was allowed, after objection, to say that his absence on Thursday was in consequence of the assurance received from Black that the land should bring seven hundred dollars.

We do not see why it was not competent in him to explain the cause of his non-attendance and apparent inattention to his own interest, when he was aware of the intended resale, if the first bid was not complied with by payment, or in what respect the answer could be obnoxious to just complaint.

2. The court refused to charge that there was no evidence to sustain the 4th issue and it should be withdrawn, or the jury directed to return a negative answer.

The court properly declined to so charge in the face of the testimony of the circumstances under which the sale was made to the plaintiff. The manifest result of his management, if upheld, is to put in him the title to land worth twenty times the sum paid, and this by practices, if the testimony be accepted, inconsistent with good faith and fair dealing towards the owner whose property has been sacrificed, and fails to meet a proper share of his indebtedness. The difficulty is not obviated by the proffer of the plaintiff's counsel to apply the full amount of the previous bid to the executions, that is, in effect to raise the price to that sum, for the defendant's legal right is to have a fair sale, and that his property shall bring the largest sum that any bidder

may be willing to give, and this sum appropriated to the discharge of his debts. Whatever means are used to obstruct this legal right of the debtor and secure his property to the execution creditor for an unreasonable price, is an abuse of legal process which the law will not recognize and uphold. In our view there was evidence, and its weight and sufficiency it was the province of the jury to determine.

3. The next and most serious objection to the charge is, that it was not all put in writing, after a request from plaintiff's counsel that it should, according to the directions of C. C. P., §238, which provides "That every judge, at the request of any party to an action on trial, made at or before the close of the evidence, before instructing the jury on the law, shall put his instructions in writing, and read them to the jury; he shall then sign and file them with the clerk as a part of the record of the action."

It is stated in the case that when a new trial was asked, after verdict, the plaintiff assigned as error, that, after the request for a written charge, the court said "anything orally to the jury." The statute neither in purpose nor terms goes to this extent, nor does it apply to the requirement in the preceding section (237), that the judge "shall state in a plain and correct manner the evidence given in the case," but it does not embrace the further direction that he shall "declare and explain the law arising thereon." The instructions to be written and read are such as expound the law and are reviewable on appeal. This is the plain meaning and effect of the words that the judge, "before instructing the jury *on the law*, shall put *his instructions* in writing, that is, his instructions as to *what the law* is arising upon the different aspects of the evidence and the admissible hypothetical findings of the jury, in order to a revision and correction when erroneous.

Moreover, the statutory mandate positively forbids any verbal explanatory comments which may affect or modify the written language and tend to mislead the jury as to its purport or

aim.   The propositions embodied in the writing must stand
in their assumed form, not added to or diminished by any con-
temporary and extraneous words falling from the lips of the
judge.   The jury must gather the meaning of the instruction
solely from the written words in which it is conveyed, as must
the revising court in passing upon its correctness in law.

Similar statutes are in force in many of the states, some of
them more stringent in their exactions and making a disregard
of them *an error in law,* entitling the party to a new trial.

The numerous citations from the reports of other states con-
tained in the carefully prepared and elaborate brief of appel-
lant's counsel, showing much research and successful labor on
his part, fully sustain the views we have taken of the construc-
tion and operation of our own enactment.

The most important and pertinent cases we find on examina-
tion are the following: *Basworth* v. *Barker,* 65 Ind., 596;
*Davis* v. *Foster,* 68 *Ib.,* 238; *Shafer* v. *Stinson,* 76 *Ib.,* 374;
*Battorf* v. *Shelton,* 79 *Ib.,* 98; *Ray* v. *Wooters,* 19 Ill., 82;
*Pimberthy* v. *Lee,* 2 Wis., 261; *Gile* v. *People,* 1 Col., 60; *Black*
v. *State,* 31 Texas, 574; *Hardy* v. *Turner,* 9 Ohio St., 400;
*Wilson* v. *Town of Granby,* 47 Conn., 59; *Paris* v. *State,* 2
Iowa, 449; *Dixon* v. *Florida,* 13 Fla., 636; *Payne* v. *Common-
wealth,* 31 Grattan (Va.), 858, with many others to the same
purport.

In *Ray* v. *Wooters, supra,* decided in 1857, SKINNER, J.,
declared the requirement so imperative that oral instructions,
given under a statute which provides for written instructions
in all cases, civil or criminal, before the petit jury, and prohibits
any oral qualifications, modification or explanation of those com-
mitted to writing, even when conceded to be immaterial, were
fatal to the verdict and called for a new jury.

The substance of these adjudications conforms to the interpre-
tation which our own enactment bears, in the exclusion of ver-
bal comments.

Now, what are the facts in reference to this exception set out
in the case made up on the appeal?

The special instructions requested for the plaintiff, which, however, do not appear to have been signed by counsel, or at least such signature is not annexed, as directed by section 239, were read over to the jury and reasons assigned for refusing them, written on the margin of the paper containing the instructions: "The court moreover did give instructions to the jury orally, but gave no instructions upon legal questions different from those set out in the *written charge.*"

There is no suggestion to the contrary of this; and if there were, we should be disposed to hold that the verbal part should have been also in writing, so as to enable us to see if there was a variance or modification which may have misled the jury in considering both, and not to leave this to the opinion of the judge. The very aim of the statute is that the jury shall hear only what is put in writing, for the judge is directed "to *read* them (the instructions) *to the jury.*"

It is not the policy or purpose of the statute, nor does the language used bear such rigorous construction as to forbid any and all oral expressions from the presiding judge. As what he may tell the jury in matters of law for their information and guidance must be *written and read,* so he is not permitted to add to, take from, modify or explain what he delivers as his charge, for this would be to change perhaps the meaning which would otherwise be ascribed to the writing and produce the very mischief intended to be remedied. But the act, upon any reasonable interpretation of its terms, does not go further and put an interdict upon every oral utterance which is in precise accord with what is written and affects it in none of the suggested particulars, at the peril of a *venire de novo* if he does thus speak. This would be to subordinate substance to form and subserve no useful purpose.

It is expressly stated in the case that nothing was said varying in any respect from the legal propositions submitted in writing, nor does the appellant suggest the contrary. Hence, the written instructions must be understood as correctly and fully embodying

the rules and principles of law communicated to the jury, and be regarded as a compliance with the demands of the law. Yet it is prudent and safe, and this cannot be too strongly impressed upon the minds of those who administer distributive justice at jury trials, when the charge is put in writing it should be simply read over, without outside remark of any kind in the hearing of the jury, and thus controversies, such as have arisen in this case, be avoided.

The charge itself, in so far as it relates to the fourth issue, and the evidence bearing upon it, is not obnoxious, as we have already said, to just complaint.

So much of it as refers to the duration and force of docketed judgments has no material bearing upon the real controversy, and the error in regard to a docketed justice's judgment, subjecting it to a limitation shorter than that which applies to others originally rendered in the superior court, does not enter into our consideration in determining the appeal. The result depends wholly upon the finding upon the last issue, irrespective of the responses to the others.

But there is error in the rendition of final judgment by which the land is restored to the judgment debtor on his return of the price bid and interest.

In *Crews* v. *Bank*, 77 N. C., 110, the defendant derived title to the land under a sheriff's sale made on September 6th, 1869, which the jury found was brought about by a fraudulent combination between the execution debtor and his creditor, the plaintiff purchasing in suppressing competition. The plaintiff bought at a subsequent sheriff's sale under a later docketed judgment.

Delivering the opinion, RODMAN, J., says: " In many cases it would work an obvious injustice to declare the sale void, because the purchaser had stifled competition and obtained the property for less than its value. What he paid has gone to the payment of debts of the defendant in the execution which were a lien upon the land, and if the sale is set aside at all, it should

be set aside altogether, and the purchaser put in the condition in which he was before or be subrogated to the place of the creditors *pro tanto.*" He adds:

"If the sale to him (the execution creditor and purchaser) was held void, he could still take out execution, *at least,* for the excess of his judgment over his bid, and sell the land again (*Halyburton* v. *Greenlee,* 72 N. C., 316), and perhaps might for the whole original amount, disregarding the supposed payment. I know of no authority to the contrary."

So in *Young* v. *Greenlee,* 82 N. C., 346, where fraud and combination to stifle bidding between the debtor and purchaser were charged, DILLARD, J., speaking of the effect upon the title, says: "His (the sheriff's) sale and deed passed the legal title to Flemming, and by his deed it was conveyed to and now resides in the *feme* defendant. Against a legal title thus communicated, a purchaser at a subsequent sale under a junior judgment and execution cannot prevail in an action, basing his right of recovery on the legal title alone. The remedy in such case must be by an action impeaching the elder title, and setting forth the special facts calling for the exercise of the equitable powers of the court to put the older title out of the way, in whole or in part." This ruling was affirmed on an application to rehear, 85 N. C., 593.

The defence here is in effect an impeachment in equity of the title acquired by the plaintiff, and the relief cannot go beyond the setting aside the sale and restoring the parties to the *status* they occupied previous thereto, and without prejudice to the plaintiff's remedies, from the lapse of time since. This is the full measure of the defendant's equity, and it affects the plaintiff only by depriving him of an estate which he acquired by unlawful means and under the form of legal process. The sale must therefore be set aside and the land again exposed to sale, the proceeds arising from which will be paid over according to the priorities of the several executions as they existed on the day of the sheriff's sale, which is thus put out of the way.

It must be declared that the judgment below is erroneous, and

·this will be certified, to the end that judgment be rendered according to this opinion, and the cause proceed in the court below.

Judgment accordingly.