STATE v. WILLIAM ADAMS et al.

*Larceny—Intent—Connivance by the Owner of the Property.*

1. Where one forms the intent to steal and carries out such previously formed design he is guilty of larceny, notwithstanding the owner of the property is advised of the intended larceny, appoints agents to watch him and, with a view of having him subsequently punished, does not prevent the commission of the theft.

2. Although the intent to steal certain property is formed and carried out, the perpetrator is not guilty of larceny if he has been persuaded by a servant of the owner, at the latter's instance, to commit the theft.

3. Larceny cannot be committed when the owner, through his agent, consents to the taking and asportation, though such consent is given for the purpose of apprehending the felon.

4. Larceny cannot be committed unless the property be taken against the will of the owner, the object of the law being to prevent larceny by punishing it, and not to procure the commission of the crime in order that the offender may be punished.

5. An exception "for refusal of prayers for instructions" does not embrace a refusal or failure to grant a prayer to put the charge in writing.

6. When a demurrer to evidence is overruled, the defendant should not introduce evidence; if he has evidence which he intends to introduce, he should take advantage of the failure of the plaintiff to make out a case by a prayer to instruct the jury.

The defendants William Adams and Susan Adams, his wife, were indicted for larceny of cotton, the property of one Palmer, and were tried before *Meares, J.,* and a jury, at February Term, 1894, of the Criminal Court of MECKLENBURG County. The facts are sufficiently adverted to in the opinion.

On the trial the first witness introduced by the State was one T. J. Wilson. This witness testified, in substance, that one Abram Palmer conducted a farm near to his (witness's) place of residence, and situated one mile and one-half from Charlotte, and that he had some cotton stored in his barn on this farm, and that at the time of the alleged larceny Palmer was living in Charlotte, and confined to his house by sickness. That the witness, while concealed in a thicket of bushes overheard a conversation between Charles Lindsay and one Lee Sims, in which they discussed a raid which was to be made on Abram Palmer's cotton barn. In consequence of hearing this conversation, and also receiving a message from Palmer, the witness called to see Palmer in Charlotte on the following Monday and told him about the conversation he had heard between the aforesaid Lindsay and Sims. Abram Palmer then requested the witness to watch out for the thieves, and do whatever he might think advisable to detect them, as he was too sick to protect his property. Palmer also told the witness that Julia Harris, a hired servant on his farm, had been to see him and told him that she had gone to the house of the defendant Sue Adams to obtain some thread, and that Sue Adams' husband, William Adams (the other defendant), was not at home, and that the defendant Sue Adams conducted her (Julia) into a back room and asked her (Julia) if she could not make a raise. That at first she thought that Sue Adams was alluding to corn, because on a former occasion Sue had proposed to her to steal some corn from Abram Palmer, but Susan told her that she did not want corn, but that she wanted

cotton, and that Julia then said that she had no cotton, and then Sue Adams said to her that Abram Palmer had cotton in his cotton house, and you can get it. That Palmer also said he had instructed Julia to exert herself to give all the assistance in her power in catching the thieves, and also to request him (the witness) to come and see him about it. The witness had accordingly gone that (Monday) night to Abram Palmer's farm to watch for the thieves, and he told Julia Harris what he had come for, and told her also what Abram Palmer had told him, and Julia Harris then said when she left Abram Palmer's house that morning she saw the defendant (Sue Adams) and told her she could get the cotton ; it was all right. The witness watched all that (Monday) night until 3 o'clock, but no one came to the cotton house. The witness had gone back to watch the cotton house on Tuesday night, and Julia Harris told him that after he (witness) had left on Monday night the defendant William Adams came to get some cotton, but that she would not let him have it, because he (witness) had gone away. The witness testified that he again returned and watched until it was very late on Wednesday night and no one came, and he then filled up a couple of sacks with cotton, and leaving one of those sacks of cotton in the cotton house he gave the other sack to Julia Harris, and told her to go to the defendant William Adams' house and to give it to him and to tell him that he could get some more cotton. The defendant's house is situated about three hundred yards from Palmer's cotton house. Witness saw Julia Harris take the sack of cotton as he had told her to do to the defendant's house, and in a little while Julia Harris and the defendant William Adams came to the house and Julia stepped outside and the defendant William Adams entered the cotton house and then came out of it with the sack of cotton, weighing about seventy pounds, and went home with it on his shoulder. Witness was secreted near the cotton house, looked at

his watch immediately after defendant left with the sack of cotton, and it was 3 o'clock Thursday morning. On Thursday night the witness filled another sack of cotton and told Julia Harris to take it to a certain place about fifty yards from the cotton house where he could see it, and to go and tell the defendant Sue Adams that it was there. He saw Julia carry the sack to the place, and in a little while the defendant Sue Adams came and picked it up and carried it home. This was done five minutes before 7 o'clock, and it was after dark. The witness heard Julia Harris testify in this case at the Magistrate's trial. She swore that witness had promised her five dollars for assisting him in catching up with the defendant William Adams, which witness denied. She also swore that Abram Palmer authorized her to sell the cotton.

Julia Harris (a State's witness) testified that she lived on Abram Palmer's place and worked for him. That on Monday evening she went to the defendant Sue Adams' house to get some thread. Her husband, the defendant William Adams, was not at home, and Sue Adams carried her into a back room and asked witness if she could not make a raise. The witness thought at first that defendant Sue Adams alluded to corn, because defendant had proposed to her to steal corn from Abram Palmer last summer, and replied to her that she had no corn. Sue adams then said that it was not corn but cotton that she wanted. Witness then told her that she had no cotton. Then Sue Adams said to witness that Abram Palmer had cotton in his cotton house, and that she (witness) could get it. The witness did not make any agreement with her. Abram Palmer was sick at his house in Charlotte. Witness went to his house and told Palmer what defendant Sue Adams had said, and that she wanted witness to steal his cotton. Palmer told her to tell Mr. Wilson to come and see him, that he wanted him to watch the cotton house and try and catch the thieves. Wit-

ness then went to the defendant Sue Adams and told her they could get the cotton. The witness Wilson came to the cotton house Monday night, and she told him what she had said to Sue Adams, and he watched till three o'clock and then went away  After Wilson had left the cotton house where he had been watching, the defendant William Adams came and wanted to get some cotton but she would not let him have it, because Mr. Wilson had left. Mr. Wilson came back on Tuesday night and witness told him that the defendant William Adams had come for cotton after he (Wilson) had left on Monday night. Wilson watched the cotton house on Tuesday night but no one came. Wilson came to watch the cotton house on Wednesday night, and watched till a late hour, and then he filled up two sacks with cotton. He left one of these sacks in the cotton house and gave her (Julia) the other sack and told her to take it to the house of William Adams and tell him (William Adams) that he could get more cotton. That she then took the sack of cotton to the house of the defendant William Adams and delivered it to him and told him that he could get more cotton. He said he could not pay for it until he weighed it and sold it, that he wanted to make out a bale. That the defendant William Adams then went back with her to the cotton house, and that she remained on the outside while the defendant William Adams entered the cotton house and took the sack of cotton which the witness Wilson had left there, and carried it off to his house. The defendant Adams promised to pay her one dollar for the cotton. It was between five and six o'clock Thursday morning when she carried the sack to defendant Adams' house, and they returned together to the cotton house. That the witness Wilson came back Thursday night and filled up a sack of cotton and told her where to put it, in a place where he could see it, and then to go and tell Susan Adams (defendant) that she could get it, and accordingly she did carry the sack of cotton to the desig-

nated place, about fifty yards distant from the cotton house on Palmer's land, and then she went to the house of defendant Susan Adams and told her where she could find the sack of cotton, and then the defendant Sue Adams went to the place and took the sack of cotton and carried it to her home. This witness admitted on the cross examination that she did swear on the Magistrate's trial that the State's witness, Wilson, had promised to pay her five dollars to help catch up with the thieves but that the statement was not true; that she had never been in Court before that time, and there was a large number of people present, and that she was much frightened, and did not know what she was saying. That the truth was that the witness Wilson did not promise to pay her five dollars, and also that she did not swear before the magistrate that Abram Palmer had given her authority to sell the cotton, and that Palmer had never given her permission to sell the cotton.

Abram Palmer testified that he owned a farm situated about one and one-half miles from Charlotte, and at the time of the alleged larceny he was sick and was living in Charlotte, and that the witness Julia Harris worked for him on his farm. That on the evening of the Monday spoken of, she (Julia) came to his house in Charlotte and told him she had been to see the defendant Susan Adams that day to get some thread, and that Susan Adams had taken her into a back room and asked her if she could not make a raise, and that she (Julia) thinking that Susan Adams meant corn, for the reason that Susan had proposed to her last summer to steal some corn from him (Palmer), replied to Susan that she (Julia) had no corn. That Sue Adams then said that she did not want corn, but that she wanted cotton, and that she (Julia) answered that she had no cotton. Then Sue Adams said to witness, "Abram Palmer has cotton in his cotton house, and you can get it." She told him that Susan Adams wanted her (Julia) to steal his cotton. That she had

made no agreement with Susan Adams up to that time about it. The witness told the witness Julia Harris to tell the witness T. J. Wilson to come to see him, that he wanted him to watch the cotton house and do whatever he might think was necessary to catch the thieves, and that she must assist him. That soon after she had left, the State's witness T. J. Wilson came to his house to see him. Charles Lindsay was with him. That Wilson told him about a conversation between one Sims and Lindsay, which he overheard, about a raid to be made on his cotton house. He then told Wilson what Julia Harris had just told him, and requested Wilson to watch his cotton house, and to do everything he might think best and was in his power to do in order to catch the thieves. That he was sick and unable to protect his property.

The counsel for the defendant now asked the Court to require the State to elect which one of the alleged larcenies they would rely upon to convict, the one by William Adams on Wednesday night, or the one by Susan Adams on Thursday night; and, after some discussion by counsel, and the Court intimating that the State should elect, the prosecution announced that they would rely upon the taking by William Adams on Thursday morning.

The counsel for defendant now demurred to the evidence as being insufficient to convict, and asked the Court to instruct the jury that there was no evidence of a conspiracy, and that the evidence was not sufficient to convict either of the defendants.

The Court refused to give the instructions asked for, and the defendants' counsel excepted. The defendants were convicted, and appealed.

*The Attorney General,* for the State.
*Messrs. Clarkson & Duls* and *Maxwell & Keerans,* for defendants (appellants).

CLARK, J.: The Court correctly told the jury that " if there

was the guilty intent previously formed by the defendant to steal certain property, and he carried out such design previously formed, he is guilty, notwithstanding the owner of the property was advised of the intended larceny, appointed agents to watch him and could have prevented the theft, but did not do so, and allowed him to commit the theft, with a view of having him subsequently punished." It was error, however, further to tell them that if there was the previous intent to steal, the defendant would be guilty, notwithstanding the owner's agent had told a servant to go to the defendant's house and persuade him to come and steal the sack. *Dodd* v. *Hamilton,* 4 N. C., 471; *State* v. *Jernagan,* 4 N C., 483. It was also error to refuse the fifth prayer for instruction, "That larceny cannot be committed when the owner, through his agent, consents to the taking and asportation, though such consent was given for the purpose of apprehending the felon," and likewise the sixth prayer, "That larceny cannot be committed unless the thing be taken against the will of the owner." The object of the law is to prevent larceny by punishing it, not to procure the commission of a larceny that the defendant may be punished. The evidence for the State was that the owner's agent (Wilson) having information of an intended theft of cotton by the defendants, watched the cotton house Monday and Tuesday nights without anyone coming. That he returned Wednesday night and watched till very late, and, no one coming, he filled up a couple of sacks with cotton, and leaving one of the sacks in the cotton house, he gave the other sack to one Julia Harris, and told her to go to the defendant's house, three hundred yards distant, and give it to him and tell him that he could get some more cotton. Julia did as directed, and in a little while she returned with the defendant, who entered the cotton house, took the other sack of cotton upon his shoulder and carried it home. The Court should have sustained the demurrer to the evidence. It is not necessary

to consider the evidence as to the wife, for the election of this transaction discards the consideration of the evidence as to the taking by her Thursday night. It is also unnecessary to consider the other points raised. We may note, however, that if, as it would seem from the case, the Judge, notwithstanding the prayer at the close of the evidence to put his charge in writing, " also fully explained and instructed the jury as to the application of the propositions of law laid down in his *written charge* and instructions given as to the different phases of the evidence in the case, and pointed out to the jury the grounds upon which the defendants rested their defence, and explained such phases of the case arising from the evidence introduced by the State and the defendants," there was manifest error. When there is a prayer to put the charge in writing (*The Code*, § 414), all the instructions as to the law must be reduced to writing (though not the recapitulation of the evidence). *Dupree* v. *Insurance Co.*, 92 N. C., 417; *Lowe* v. *Elliott*, 107 N. C., 718. If this were not so, section 414 would be nugatory. We can only incidentally refer to the point and not declare error in that regard, as there is no exception for a refusal or failure to put the charge in writing. *Taylor* v. *Plummer*, 105 N. C., 54; *Lowe* v. *Elliott, supra.*

The exception " for refusal of prayers for instructions " does not embrace a refusal or failure to grant a prayer to put the charge in writing. If the proper exception on that ground had been made, the case should, and doubtless would, have contained the written charge, and, if any oral charge had been given, it should have been set forth that this Court might see that it was mere repetition of the written charge. It is only out of deference to the authority of *Currie* v. *Clark*, 90 N. C., 355, that the Court will permit even that, and will not extend the exception. It may be noted that the head note in *State* v. *Young*, 107 N. C., 715, goes beyond the opinion of the Court.

When the demurrer to evidence is overruled, the defen-

dant should not introduce evidence. Starkie on Ev., 797–8; 2 Tidd Pr., 865–6; Whar. Cr. Pl. and Pr. (9th, Ed.), §§ 407, 706; *Hutchins* v. *Commissioners*, 82 Pa. St., 472.

If the defendant has evidence which he intends to introduce, he should take advantage of the failure of plaintiff to make out a case by a prayer to instruct the jury after all the evidence is in.

In failing to sustain the demurrer to the evidence, and also for refusing to instruct the jury that there was no evidence to go to them, there was error. But this does not necessarily dispose of the case. *Non constat* that the State may not, in some cases, produce more evidence on the next trial. *State* v. *Rhodes*, 112 N. C., 857.                    Error.