Decided at PENDLETON 13 August, 1898.

### STATE *v.* HULL.

[54 Pac. 159]

LARCENY—CONSENT OF OWNER.—Property is not taken without the owner's consent, within the meaning of the term larceny, where an authorized agent of the owner co-operates with the suspected thieves in planning and carrying out the asportation.

From Baker : ROBERT EAKIN, Judge.

Fred. Hull and Earl Wheeler were convicted of larceny, and appeal.

REVERSED.

For appellants there was a brief and an oral argument by *Mr. William Smith.*

For the state there was a brief and an oral argument by *Mr. H. E. Courtney*, district attorney.

MR. JUSTICE BEAN delivered the opinion.

The defendants, Hull and Wheeler, were jointly indicted, but separately tried and convicted of the crime of larceny. Each appealed, and their respective appeals were heard and tried together in this court as one case, and will be so considered. The important question presented is whether the trial court erred in refusing to direct an acquittal, on the ground that the property alleged to have been stolen was taken with the consent and co-operation and assistance of the owner, through an agent employed for that purpose.

The facts, as they appear from the record, are that on September 7, 1897, one Prescott was employed by Perkins and five or six other men residing in and about Baker City, whose stock was being stolen from the range and butchered for the market, "to look after their cattle interest, and to detect, if he could, anybody molesting their cattle, stealing them, butchering them or doing them any damage." He was given full permission by his employers to butcher or use their stock in any way he might see proper "for the purpose of detecting who was stealing the cattle." Prescott immediately entered upon his employment, keeping his employers fully advised of his progress, and on the second of October informed them that Hull, Wheeler and himself were going out

that afternoon to round up a bunch of cattle, and to drive them that night over into Union County. It was thereupon arranged between him and his employers that he should proceed according to his agreement with the defendants, and that Perkins and the other parties, together with the sheriff, would secrete themselves at a certain point on the road along which it was proposed to drive the cattle, for the purpose of arresting Hull and Wheeler. In pursuance of this understanding, Prescott, Hull and Wheeler left Baker City about four o'clock in the afternoon, each going in a different direction, but meeting a few miles out of town, from whence they proceeded to a point called ".Magpie Corral," gathering up cattle as they went. After reaching the corral, Wheeler held the cattle already gathered, while Hull and Prescott went out in different directions on the range, to gather up others ; and after they had thus rounded up eighty-three head, they proceeded on their drive to Union County. Just before reaching the point where Perkins and the sheriff and his posse were secreted, Prescott rode ahead, to notify them, and, after ascertaining that everything was as planned, returned to his companions, advised them that the way was clear, and directed them to proceed. He, himself, however, fell behind, on the plea that his horse had given out.

When Hull and Wheeler reached a point in the road opposite where the sheriff and posse were in hiding, they were directed to halt, but, in place of doing so, began firing ; and, after quite a fusilade between them and the sheriff's posse, they escaped, but were subsequently arrested, indicted, tried and convicted of stealing a cow belonging to Perkins, which was in the band. Prescott testified that he noticed the cow described in the indictment at Magpie Corral, and recognized her as the property of Perkins before the drive commenced. His atten-

tion was particularly drawn to her because she was crippled, and had a large lump on her side ; and Wheeler suggested that she be cut out because of this blemish, but Hull said it was all right, as it would be dark, and she would not be noticed. On cross-examination he said : "We had the cow in the bunch when we first held the cattle there, about half a mile from the (Magpie) corral. When we drove the cattle, I knew that this particular cow was in there. Q. Did you intend to steal that cow? A. No. Q. Why didn't you cut her out? A. Fred said to leave her in. Q. Did you know whose brand and earmark that was? A. Yes, sir. Q. If you knew she was Perkins cow, if you had no intention of stealing her, why didn't you cut her out and let her go? A. I was employed to catch the other men. Q. Had Mr. Perkins employed you to do that? A. Gus Perkins did. Q. You knew it was to be put to that use, for that purpose, didn't you. A. Yes, it was. Q. How did you know it? A. Gus told me. Q. When did you obtain this information of these people? A. I think it was in September, — the seventh day of September." The witness, after further testifying, among other things, that, before starting out that day, he had a talk with Perkins, was asked : "Q. What did you tell him you were going to do? A. Round up a bunch of cattle, and drive them away. Q. Why did you tell him? A. Because I promised to. Q. What did he say when you told him that? A. He says, 'All right, we'll be out there.' Q. He said it was all right for you to round them up? A. Yes, sir. Q. And that they would be out there? A. Yes, sir. Q. And this animal, for the larceny of which this defendant is being tried, you recognized as being the property of Mr. Perkins when about half or three-quarters of a mile from Magpie Corral? I think you said you didn't

cut that out because Mr. Perkins told you that you could use it for the purpose if you wished? A. Yes, sir.''

The manner in which Prescott obtained the confidence of Hull and Wheeler and their connection with the alleged larceny, was further detailed by him as follows : '' I gained their confidence through a man by the name of Chumley. * * * Chumley came to me, and made me a proposition to go into this butcher business. I told him I would see, and it went on for several days. We had several talks, and finally he came to me, and told me, he says, ' Fred. Hull wants me to furnish him dressed beef. ' I says, 'All right; what will he give us for it? ' and he told me. I says, 'All right, we will do that; we will get a team.' * * * He was to get a team. He said Fred. Hull would furnish the team. I hadn't said anything to Fred about this work. In fact, Mr. Chumley told me he had spoken to Fred about my going in with him, and Fred didn't want to let me in. He said, ' But I will tell you what I will do; I will get you a man to work for you.' He said, 'All right.' So Chumley got me, and we got ready to go out, and the first trip something occurred; I don't remember what it was. Some one came to me, and said Fred. couldn't take the beef that night. So we didn't go. And it went on for two days, and Chumley and me took our horses and made a ride out through the country here. Fred. Hull had made him a proposition to buy some calves, that he could turn them over,— to steal some calves for him to turn over. And we went out to see if we could locate some calves. * * * I had not spoken to Hull about the matter. * * * The day after we came back from this ride was the first time I spoke to Hull. * * * Our first conversation was like this : I went to Fred, and I says, ' Chumley didn't get them cattle.' Chumley had come and told me he had quit. I says, ' That fel-

low's quit; what's the matter with us going on with
this business?' He says, 'All right, we will do that.'
He says, 'What can you do?' I says: 'We can go out
there and get these cattle, and we can handle them.
We can get all we want of them.' He says, 'All right;'
so my first attempt was to go out and get some cattle,—
three head. * * * The day before we started to drive
the cattle, Hull made the proposition that if we got this
hundred head of cattle, and drove them, and stole them,
we would divide the money equally between him and
Earl Wheeler and myself.'' When asked if anything
was said by Hull as to what particular cattle were to be
gathered up, the witness answered: '' He said his pref-
erence was Joe Geddes', Steve Osborn's and brand '16'
cattle, belonging to Mrs. Harrison;'' but the witness
testified that the cattle taken included a large number
belonging to other parties, and especially to the persons
by whom he was employed. Perkins was called by the
state, and testified concerning the employment of Pres-
cott and his duties; that he was given full authority by
his employers to use or butcher any stock belonging to
them if necessary to gain the confidence and secure the
detection of the persons who were stealing the cattle;
that he (witness) was advised on the morning of the
second of October, by Prescott, of the drive intended to
be made that evening, and assented thereto; that he
arranged with Prescott to be in waiting with the sheriff
and posse at the place agreed upon, for the purpose of
arresting the defendants, Hull and Wheeler, and was
there in pursuance of such arrangement.

Based upon these facts, the inquiry is whether the tak-
ing by the defendants of the property alleged to have
been stolen was such a trespass as will support the charge
made. To constitute the crime of larceny, as charged in
the indictment, there must be a trespass, that is, a tak-

ing of the property without the consent of the owner. It is therefore evident that the crime is not committed when the taking is by the consent, however morally guilty the taker may be. This is elementary law. But the difficulty lies in determining when the taking is by the consent of the owner in cases where he lays a plan to entrap a suspected thief. Upon this subject Mr. Bishop says: "The cases of greatest difficulity are those in which one, suspecting crime in another, lays a plan to entrap him. Consequently, even if there is a consent, it is not within the knowledge of him who does the act. Here we see, from principles already discussed, that, supposing the consent really to exist, and the case be one in which, on general doctrines, the consent will take away the criminal quality of the act, there is no legal crime committed, though the doer of the act did not know of the existence of the circumstance which prevented the criminal quality from attaching. But exposing property, or neglecting to watch it, under expectation that a thief will take this property, or furnishing any other facilities or temptations to such or any other wrongdoer, is not a consent in law ": 1 Bish. Cr. Law (5th ed.), § 262. And in *Williams* v. *State*, 55 Ga. 395, Mr. Justice BLECKLEY, in his usual clear and lucid style, puts the law thus: "It seems to be settled law that traps may be set to catch the guilty, and the business of trapping has, with the sanction of courts, been carried pretty far. Opportunity to commit crime may, by design, be rendered the most complete; and, if the accused embrace it, he will still be criminal. Property may be left exposed for the express purpose that a suspected thief may commit himself by stealing it. The owner is not bound to take any measures for security. He may repose upon the law alone, and the law will not inquire into his motive for trusting it. But can the owner

directly, through his agent, solicit the suspected party
to come forward and commit the criminal act, and then
complain of it as a crime, especially where the agent to
whom he has intrusted the conduct of the transaction
puts his own hand into the *corpus delicti*, and assists the
accused to perform one or more of the acts necessary to
constitute the offense? Should not the owner and his
agent, after making everything ready and easy, wait
passively, and let the would-be criminal perpetrate the
offense for himself in each and every essential part of it?
It would seem to us that this is the safer law, as well as
the sounder morality, and we think it accords with the
authorities : 2 Leach, 913 ; 2 East, P. C. c. 16, § 101,
p. 666 ; 1 Car. & M. 218 ; *Dodge* v. *Brittain,* Meigs, 86 ;
*Kemp* v. *State,* 11 Hump. 320 ; *State* v. *Covington,* 2 Bail.
569. It is difficult to see how a man may solicit another
to commit a crime upon his property, and, when the act
to which he was invited has been done, be heard to say
that he did not consent to it." And, again, in *Love* v.
*People,* 160 Ill. 508, (43 N. E. 713), Mr. Justice PHILLIPS
says : " It is safer law and sounder morals to hold,
where one arranges to have a crime committed against
his property or himself, and knows that an attempt is to
be made to encourage others to commit the act by one
acting in concert with such owner, that no crime is thus
committed. The owner and his agent may wait passively
for the would-be criminal to perpetrate the offense, and
each and every part of it, for himself, but they must not
aid, encourage or solicit him that they may seek to
punish."

Within the rule announced by these decisions, and
which we take to be the settled law (*State* v. *Adams,* 115 N.
C. 775 [20 S. E. 722]; *Connor* v. *People,* 18 Colo. 373 [36
Am. St. Rep. 295, 25 L. R. A. 341, 33 Pac. 159]; *Thomp-
son* v. *State,* 18 Ind. 386 [81 Am. Dec. 364, and note]),

it is clear the evidence in this case was insufficient to justify a conviction of the defendants of the crime charged in the indictment. It appears from the uncontradicted evidence that the animal which they are charged to have stolen was taken, not only by the consent and passive acquiescence of the owner, but by his express direction, and upon the advice and with the active co-operation and assistance of his agent. There was no trespass committed in the taking, and there was no taking without his consent. Prescott, who was acting by his authority and under his direction, with full power to use the animal as he might see proper, was not only present at the time of the taking, but actively assisted in planning the whole affair, and in the perpetration of the acts necessary to constitute the crime. He assisted in rounding up the cattle, and driving them out of the county, by the express consent and authority of the owner. The property having been thus taken with the owner's consent, and by the active assistance of his agent, it makes no difference legally, although it does morally, that the defendants did not know of such direction and consent, and that they supposed and believed they were stealing the property in fact. The case upon this point is no different in principle from what it would have been had the owner, instead of acting through Prescott, acted in person, and himself assisted the defendants in rounding up and taking the animal in question, the defendants not knowing him to be the owner, but believing him to be a thief and a confederate of theirs. In such case it would not be seriously contended that the defendants were guilty of larceny in taking an animal belonging to their supposed confederate, and no more can such a contention be maintained on this record. It follows that, however morally guilty the defendants may have been, their conviction is not justified by the evidence, nor warranted by the law; and the

judgment is therefore reversed, and the cause remanded for such further proceedings as may be deemed proper, not inconsistent with the opinion.

REVERSED.