The bill of indictment charged that the defendants Tom Hughes and Leonard Vance, on 8 January, 1935, "with force and arms, at and in the county aforesaid, did unlawfully, wilfully, and feloniously, in the nighttime, break and burglariously enter the Spruce Pine Store Company, Inc., store building, with the criminal intent to commit a felony therein, to wit: take, steal, and carry away money in the Spruce Pine Store Company, Inc., safe, and other articles of value in said store, with intent to deprive the owner thereof, said store building being at that time used as sleeping quarters for one of the employees of said Spruce Pine Store Company, Inc., said store being entered at nighttime, about eight o'clock p.m., against the form of the statute in such cases made and provided and against the peace and dignity of the State."
The evidence on the part of the State: Sheriff W. G. Honeycutt testified, in part: "I know Tom Hughes and Leonard Vance. I do not recollect the exact date that they are charged with breaking in the store of the Spruce Pine Store Company, at Spruce Pine, but some time ago *Page 544 
I was in the store of the Spruce Pine Store Company, about 8:00 o'clock p.m., and it was raining very hard, and a window was punched out on the back side of the building. The glass fell within six or eight feet of where I was standing, and whoever did it remained out of the building. A little later Tom Hughes came through the window and went to the safe in the office of the Spruce Pine Store Company, and was trying to work the combination. I remained quiet for three to five minutes and let him work at it, and finally I decided he was not going to be able to open it, and might possibly break the combination and damage the safe. I was right up over him in the balcony and I started down the steps, and there was a carpet and it didn't make any noise until I got two-thirds of the way down the steps and one of the steps squeaked and made a noise, and he recognized the noise and looked up at me. He had a flashlight in his left hand and was working at the combination with his right hand. He turned the light on me and then I put mine on him and told him to consider himself under arrest. C. C. Garland, deputy sheriff, and J. L. Folger, State Highway Patrolman, were with me in the building. Tom Hughes made a statement to me that if I would let him, he could go back and open the safe, and if I would let him go back he would show me, and I let him go back to the safe and make the second try after I arrested him, and he failed to open it. When I first told him to put his hands up he failed to do it, and I put my gun on him and told him to put his hands up, and afterwards I made an apology and told him he was the second man I had put my gun on, and I hated to do it, and told him he was carrying a gun and that more than likely he would kill anybody before they could arrest him, and he said if he had a gun he would have done like I did. He said he heard the Harris Clay Company would have a pay roll in that safe between $1,200 and $1,800, and he was figuring on getting that. The Harris Clay Company owns the Spruce Pine Store is my information. The Harris Clay Company operates the mine, and their pay roll comes through the Spruce Pine Store Company. He said he understood the pay roll would be between $1,200 and $1,800, and he was going to get that. That was about eight o'clock at night. It was raining very hard. After Tom got in there, I didn't give any alarm to anyone. I didn't quite understand your question about giving an alarm. I went to explain a while ago. I took the boy in the back, at the back of the Spruce Pine Company Store, Mr. Berry and Mr. Carver, if anyone else came on the outside that they would be outside and that whenever I accomplished my purpose on the inside that I would shoot my gun off one time inside, and they could apprehend whoever was on the outside when I shot. Two officers were outside, Cas Carver and Reed Berry. I came to be there because I was called by telephone to come to Spruce Pine *Page 545 
and was given information that this robbery was going to take place that night, or was thought it would take place."
The evidence of Sheriff Honeycutt was corroborated by Chris C. Garland, and in part by Reed Berry. In regard to defendant Leonard Vance, Reed Berry testified: "Tom Hughes came up there behind the Spruce Pine Store and took a little lath or piece of lumber that was there, about 1 1/2 square piece, about eight feet long, and he punched the window and broke part of it out, the large part of the light, and then he ran around down toward the shed, and we waited about ten or fifteen minutes, maybe, or not quite so long, and he came back, and that time Leonard Vance was with him, and they both came down next to the store and looked at the window and it was not all broken out, and Vance turned and walked up to the window corner of the store, where there was a door, and he looked around the building, and Tom Hughes picked up the stick and punched the remainder of the glass out, and they both ran down to the front street. We waited a little bit and they came back and came back to the upper side of the store, and about that time a car came around the street and turned and the light flashed on them, and they run back to the platform close to where we were, and they repeated that three times. Every time a car would come they would run, and they did that three times, and then Tom Hughes got up to the window and went through the window and Leonard Vance turned and ran around below Spruce Pine Store. Someone made a remark, `What is the matter? Are you yellow?' and the other one said, `Wait and see.' The conversation passed between the two men, but I don't know which one said which, and Tom Hughes went in and Leonard Vance whirled and ran down in front of the Spruce Pine Company Store, and we caught him, and Mr. Carver caught him in front of the Spruce Pine Company Store."
C. J. Carver testified, in part: "In a little while he came back, but I didn't know him at that time, but I know him now. It was Tom Hughes, and in a little while he came back and picked up the lath again and punched the window out. Then he ran off and was gone a few minutes and him and Leonard Vance came back together, and Reed Berry called their names and said it was Tom Hughes and Leonard Vance. He said that to me. I was at the door and Mr. Berry was next to the window, and Hughes didn't get enough of the window punched out, and came back and he took a piece of car or truck bed and set it up against the building and examined to see if they could go in, so they couldn't get in, and a car came along and they ran under the floor right up next to me and Mr. Berry, in about 5 feet from the door when they ran under the feed store, or the feed department or platform, and after that they went back down and they both climbed up together on this *Page 546 
piece they set up there. Tom Hughes went in and Leonard Vance came out on the corner."
The defendant Leonard Vance denied that he had anything to do with the burglary, and testified, in part: "I am one of the defendants in this case. I have known Tom Hughes about a year and a half or two years. I live in Spruce Pine. Have lived there about nine years. I remember the night that Mr. Hughes entered the Spruce Pine Store Company's store. I was on the street that night. I was up at the hot-dog stand and Mr. Hughes came in and asked me if I knew where I could get a pint of whiskey and I said I might find some, and I got it and he said let's go and take a drink, and we started in the post office and it was locked and we went to the back of the Spruce Pine Store and started to take a drink, and a car came and flashed the light and we went back under the floor and took a drink of whiskey and came on out and came down the street. I came on down the street and I don't know where Mr. Hughes went. I know nothing about his breaking out the glass. I had nothing to do with robbing the store at all and didn't know anything about it until afterwards."
The defendant Tom Hughes testified, in part: "Yes, I admit going into the store. No, Leonard Vance had nothing to do with it and did not help me. As to what happened between Leonard Vance and me on the night of 8 January, I was in Spruce Pine, in a little cafe, and saw Leonard Vance and I asked him if he knew where any whiskey was, and he said he didn't know, but thought he could find some, and I told him to go and get me a pint, and he said he would see and would be back in a few minutes, and he went and came back and gave me a pint of whiskey and it was raining pretty hard and I asked him to take a little and he said No, and I went with him and we tried to get in the post office to get out of sight to drink the pint of whiskey, and he couldn't get in and we cut right straight across, and between Spruce Pine Store and — there is an alley, and we ran in and started to take a drink of whiskey and a light flashed about that time and I ran in under the porch and Leonard came in after me, and it was raining pretty hard, and I got under there and stayed five or six or ten minutes and drank the rest of that short pint of whiskey and came out and went down the street and he went ahead of me, and I left him and never saw him any more that night until the law brought him in the Spruce Pine Store and he was handcuffed. No, I don't deny going through the window. No, Leonard Vance did not have anything to do with helping me break that light out of the window. He did not aid me in any way. He knew nothing about it so far as I know."
S. B. Cannon, a witness introduced by defendants, testified in part on cross-examination by the State: "I was at home at the time the store *Page 547 
was entered; was not present in the store when it was robbed. Q. Did you give your consent to either one of these defendants to rob the Spruce Pine Store Company's store? Or did you conspire, confederate, or agree with these defendants to enter this store and rob the safe? A. I did not. I told Scott Hickey he could go fox hunting that night. The Spruce Pine Store Company is incorporated under that name, and was incorporated at the time it was entered. Q. Have you any authority to rob that store, or to give anyone else authority to rob it? A. No, I have not. Q. Has the Hickey boy got any right to rob that store or to give anyone else authority to rob it? A. No, he has not. I had nothing to do with punching out that window or entering the store that night. The sash punched out was a pane in the upper sash in the window over part of the office. There was a footprint on the top of the desk on a book that was laying there to show where he stepped on the desk. Q. I will ask you if this window light had not been punched out just a few weeks before, on 13 December, and if there was not a footprint on this desk at the same identical place that you found it after the store was broken into? A. The same window was broken into, and there was a footprint on the desk. It was on top of the desk. I couldn't say exactly how close it was to the place where the footprint appeared on 13 December, but it was on top of the desk. The Spruce Pine Store Company has a board of directors and they meet and transact the business of the company when they want to. I get my authority from the president and vice-president. Neither of them have ever authorized me to permit anyone to rob the store, or to rob the safe, or to give the combination of the safe to anyone. Yes, I have seen Tom Hughes in the store. He was there on Saturday before he entered it. He was standing there, looking at the window that they entered, or that he entered on that night, 13 December, last. He had focused on the same window. He was looking right at the window. I don't know how long he stood there. When I saw him at the store he was looking at it. The depot is located diagonally across the street from the store, a distance of about 60 feet from the sidewalk. It is a concrete pavement between the store and depot. Going from the sidewalk back up the store to where the window was entered is a distance of 90 feet. It is not concrete back of the store, but there is a concrete sidewalk up the side of the store. The feed store has a loading platform from the ground. A man could not stand under it to take a drink. I saw the frame that was put up at the window laying on the ground. I did not look at it for signs of mud on it. I know Tom Hughes when I see him. Have known him for two years. I couldn't swear about his general character. I don't know. I have heard the public say it is bad. When I started home that night, I met Tom Hughes and Leonard Vance on the sidewalk. *Page 548 
They were together. That was about 7:00 o'clock. The store was closed and I had walked down to the drug store and met them between the drug store and our store. I wanted the officers in the store that night to catch these robbers that were out robbing the country. That was the reason I got them to come there. My store has been robbed three or four times. I had nothing to do with robbing the store or getting anyone else to rob it. No, I never encouraged anyone else to rob the store. Yes, I advised Mr. Hickey what to do in regard to the robbery that Tom Hughes has admitted. No, I did not advise him to encourage these two defendants to rob the store. I did not want the store robbed. I think I know just exactly what aiding and abetting means."
Certain evidence of defendant Hughes, Hickey, and Cannon was excluded by the court below, to which the defendants excepted. The evidence on this aspect is as follows:
Tom Hughes: "Q. Go ahead and state what that conversation was? A. I went to him on the night of the 3d or 4th and asked him — I said, `Scott, a fellow told me you had the combination to the safe in the store, and wanted somebody to break in and get the money. What about it?' I first said, `I want to ask you a question, and don't want you to say anything about it,' and he said, `I won't say anything about it,' and we shook hands and then I told him about this fellow wanting to go in, and he wanted to know who this fellow was that told me about the combination. I didn't tell him and he said, `Well, I don't know. I don't think I can do the old man or the boss that way,' and I said, `If you don't want to do it, drop it and nothing will be said about it,' and he said, `I will think it over,' and I left and went on home. Next day I came back up there and Mr. Hickey was in the window working, and he motioned for me to come over to the store and he said, `What time are you going home tonight?' and I said I guessed it would be pretty late, and he said for me to come in before I went, that he wanted to see me and I said `All right,' and then when I came back by there he told me to go up to the cafe and wait and he would come up there, and I waited for him and he came in and sat down where I was and said, `I decided to take you up on that proposition.' Then he said he could get the combination. He said he didn't know whether he could get the four numbers or not, but that he could get three numbers of the combination, and I told him I thought I could get it open, and we figured out about how much money would be in the safe that night, and I went on back home and came back on Saturday. I came back and walked in the store, and Hickey asked me to be in the cafe that night, and I did, and that was on Saturday. Well, about 6:30 or 7:00 o'clock we had supper, and he said, `I happened to the damnedest luck this morning ever was,' and he *Page 549 
said that morning early a man came in with a big order, and that he had a check, and that he filed the order and ran up to the office to get it cashed, and that Bill had not opened the safe, and that he missed it the first time, and he said he went back over the combination slowly and that he stood behind him and that he had the combination, and he handed me the combination, and also told me where to break in, and I suggested one place and he suggested another. I suggested that I would go in at the front and he said that would never do, and for me to go in at the back. He said there was an old piece of truck laying there and it would be easy to crawl in the window, and that right under the window there was a desk, and that I could step right down on the desk, and he told me there was a bar went down behind the door, and said I could pull the bar out and go out that way, and he said the boy that was sleeping in there, that he would take him home with him. Said he would make out like he would go fox hunting and they would go out and listen to the fox hunt, and he would stay at his house and come back to the store the next morning. We figured out about how much the pay roll in the safe would be, the pay roll of the Harris Clay Company. I didn't know at the time that the pay roll was there, and he said the pay roll would be in Monday or Tuesday, said they had to pay on the 10th, or about that time, and he didn't know exactly what it would be, but it would be from $1,200 to $3,000. That before the depression it had run as high as $5,000 a month, the pay roll did. Q. State whether or not he said anything about a division of the money after the robbery. A. Yes, I said, `Where will we split the money?' and he said he didn't know. I asked him if it would be all right for me to go to his house, and he said, `Hell, no,' and I said if I robbed the store I would meet him the following night on the C. C. O. Railroad, where the bridge goes across the — Q. State whether or not he took Jack Dale out of the store that night. A. Yes, I saw Jack Dale and Scott Hickey on the street that night."
Scott Hickey: "I live at Spruce Pine and work for the Spruce Pine Store Company, under Mr. Cannon. He is manager of the Spruce Pine Store Company. Yes, I remember the night that Tom Hughes is alleged to have entered the Spruce Pine Store. I had a conversation with Tom Hughes prior to the time the store was entered. Q. What was that conversation? A. It was on 2 January, on the evening of the second day. Tom Hughes came into the store and said he wanted to ask me a question and wanted to know where we could get, and I told him right there was all right, and he said he wanted me not to say anything about it, and I told him it was all right, to go ahead and that I would not say anything about it, and he said a fellow sent him to me and he asked if I knew where he could get the combination to the safe *Page 550 
of the Spruce Pine Store Company, and I told him I thought that would be a mighty nice way for me to treat my company and the boss, and about that time a lady came in and I had to wait on her, and leave him, and he said, `If you ever get hard up sometime, let me know,' and I didn't see him any more for three or four days, or maybe two days, and he came back up the street and I motioned for him to come in the store, and I told him I wanted to see him before he left town, so he came back that afternoon, and I told him that I would meet him up at the cafe, and I went in and he was sitting in a booth at the cafe, and I walked up and he said, `D — n you, I knew you would take me up,' or something to that effect. So he asked me if I could get the combination, and I told him I thought I could, and he wanted to know how much the pay roll would be, the Harris Clay Company, and told me if I would get the combination, he would split fifty-fifty, and he also told me if I would get the combination, he would tell me lots of other things that would make the hair stand up on my head. I believe that was about all that was said that day. I had another conversation with him on Saturday night, and I met him in the cafe and we had supper and I gave him a combination. Then he told me about a number of other things he had done in Tennessee in regard to the robbery. He told me about holding up a man and robbing a safe that was connected with the Bimberg Plant. I don't remember his name. He also told me about a man and his wife and about his buddy holding out on him, and he told me about another robbery of a safe that he had been connected with at Elizabethton and he and his partner got $1,600 and they hid it pretty close to where they stayed and some school children found it and they got hot on him and he had to leave. He also told me about the A. P. Store being broken into, and that in Spruce Pine, and I asked him where the law was when the store was being broken into, and he said, `Where they always are.' I believe that was about all that was said at that time. Q. This paper, marked `Exhibit A,' are these the numbers you gave to Mr. Hughes? A. Yes, I think so. Q. Where did you get it, did Mr. Cannon give you that? A. After I had my first conversation with Tom Hughes, I saw Mr. Cannon about it. I had a conversation with Mr. Cannon soon after I saw Tom Hughes and had the conversation with him that I related a while ago. Q. Will you state the conversation that you had with Mr. Cannon? A. After the night I first saw Tom Hughes, I had a conversation with the boss, Mr. Sam Cannon, the first thing next morning. I didn't see him that night. In that conversation I told him what Mr. Hughes had told me in regard to the safe. He told me if Mr. Hughes wanted the combination of the safe we would try to give him one, or something to that effect. He said that we would give him a combination to the safe and go ahead and let him rob the *Page 551 
store if he wanted to. When I first went up I told him about this. I told him that Mr. Hughes came to me in regard to the safe and he said we had been having a good many robberies and there was only one way to break it up, and we would give Mr. Hughes a combination to the safe. I believe that was all that was said. The next time I saw Mr. Hughes, I told him I wanted to see him before he left town. That is when I saw him up in the cafe. No, Mr. Cannon did not say anything to me about helping Jack Dale out of the way at that time, but before the robbery happened, he said that Jack Dale and I could go fox hunting that night. I took Jack Dale fox hunting according to instructions. I got the combination to give to Mr. Hughes. Mr. Cannon gave me the numbers to write down, and directed me to give it to Tom Hughes, and I gave it to him. I informed Mr. Cannon of the night that Tom Hughes was to break into the store. No, I didn't hear Mr. Sam Cannon's conversation with the officers after the robbery occurred." Like evidence of S. B. Cannon was excluded.
The jury rendered the following verdict: "Tom Hughes is guilty of burglary in the second degree, and that the defendant Leonard Vance is guilty of aiding and abetting the defendant Tom Hughes in the commission of the crime of burglary in the second degree."
Judgment of the court was rendered on the verdict. Defendants made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
There was no exception to the charge of the court below, the exclusion of evidence on the trial in the court below is the bone of contention. The defendants contend: The real, controlling question involved in this case is: Whether or not the principle laid down in the opinion in the case ofState v. Goffney, 157 N.C. 624, applies to the facts of this case. We think the facts in this case differ materially from the Goffney case, as will be hereafter shown.
The defendants are charged with the burglary of the Spruce Pine Store Company, Inc. The defendant Tom Hughes admitted going into the store, and testified: "Yes, I tried to work the combination, tried awfully hard. I meant to take every dollar in the safe. My purpose in going there was to rob that safe. Yes, I was trying to work the combination when the sheriff came up. He put his gun on me. Afterwards he apologized and told me that I was the second man he had ever *Page 552 
put his gun on. I told him I didn't blame him for it, and that I would have done the same way. I don't know if I had had a gun if I would have put my gun on him."
There is no evidence that Cannon had any authority to consent to the defendants burglarizing the Spruce Pine Store Company, Inc., nor was it in the course of his employment, express or implied. Before the acts or statements of an agent are admissible against the owner, it must be shown that they are authorized, or in the course of the employment, or such facts as would indicate implied authority. Gazzam v. Union Fire Ins. Co:,155 N.C. 330; Rangeley v. Harris, 165 N.C. 358; Bank v. Boone-Fork Mfg.Co., 186 N.C. 744; O'Donnell v. Carr, 189 N.C. 77; Elmore v. R. R.,189 N.C. 658 (672); Bixler v. Britton, 192 N.C. 199. In fact, Cannon testified, and we think it competent: "I was at home at the time the store was entered; was not present in the store when it was robbed. Q. Did you give your consent to either one of these defendants to rob the Spruce Pine Store Company's store? Or did you conspire, confederate, or agree with these defendants to enter this store and rob the safe? A. I did not."
The exclusion of defendants' evidence on the record was not error, and we think if it had been admitted it would have been no defense. There is a vast distinction in law and morals in cases of this kind, (1) where an agent or servant under authority of the owner leads another into temptation to commit the crime, and (2) one who has the guilty intent previously formed to commit the particular crime and steps are taken to detect the perpetrator.
In 18 A.L.R., p. 174, the principle is stated thus, citing numerous authorities: "Where the owner, in person or by his duly authorized agent, suggests to the accused the criminal design, and actively urges, cooperates with, and assists the accused in the taking of the goods, such conduct amounts to a consent to the taking, and the criminal quality of the act is wanting." In the old English case of Reg. v. Lawrence (1850), 4 Cox C. C., 438, it is said: "The reason is obvious, viz.: The taking in such cases is not against the will of the owner, which is the very essence of the offense, and hence no offense, in the eye of the law, has been committed. The offender may be as morally guilty as if the owner had not consented, but a necessary ingredient of legal guilt is wanting." See U.S. v.Whittier (1878), 5 Dill., 35, Fed. Cas. No. 16,688. 66 A.L.R., 506, etseq.
In State v. Adams, 115 N.C. 775, we find: "The court correctly told the jury that `if there was the guilty intent previously formed by the defendant to steal certain property, and he carried out such design previously formed, he is guilty, notwithstanding the owner of the property was advised of the intended larceny, appointed agents to watch him, *Page 553 
and could have prevented the theft, but did not do so, and allowed him to commit the theft, with a view of having him subsequently punished.' It was error, however, further to tell them that if there was the previous intent to steal, the defendant would be guilty, notwithstanding the owner's agent had told a servant to go to defendant's house and persuade him to come and steal the sack. Dodd v. Hamilton, 4 N.C. 471; State v. Jernagan, 4 N.C. 483. It was also error to refuse the fifth prayer for instruction. `That larceny cannot be committed when the owner, through his agent, consents to the taking and asportation, though such consent was given for the purpose of apprehending the felon,' and likewise the sixth prayer, `That larceny cannot be committed unless the thing be taken against the will of the owner.' The object of the law is to prevent larceny by punishing it, not to procure the commission of a larceny that the defendant may be punished. The evidence of the State was that the owner's agent (Wilson), having information of an intended theft of cotton by the defendants, watched the cotton house Monday and Tuesday nights without anyone coming. That he returned Wednesday night and watched till very late, and, no one coming, he filled up a couple of sacks with cotton, and leaving one of the sacks in the cotton house, he gave the other sack to one Julia Harris, and told her to go to the defendant's house, three hundred yards distant, and give it to him and tell him that he could get some more cotton. Julia did as directed, and in a little while she returned with the defendant, who entered the cotton house, took the other sack of cotton upon his shoulder and carried it home. The court should have sustained the demurrer to the evidence." InState v. Adams, supra, the agent of the owner sent one Julia Harris to Adams' house with a bag of cotton with an invitation "tell him he can get some more cotton." The agent of the owner procured Adams to get the cotton and sent a party to assist him in doing so. The writer of this opinion appeared for Adams in the above case, some 40 years ago, and obtained a new trial.
It is the contention of the defendants that the case of State v.Goffney, supra, is on all fours with the present one. We do not think so. There the owner of a store instructed Richard (his servant) to induce defendant to break in his store. (P. 626): "It appears that Barnes, the owner of the building entered, directed his servant Richard Farmer to induce the defendant to break in his (Barnes') store; that the servant obeyed his orders, and that he and defendant entered the store together, and that Barnes was present watching them, and arrested defendant after he entered." The Court rightfully held there was no burglary, saying, "If it were possible to hold the defendant guilty of a felony under such circumstances, then Barnes could be likewise convicted of feloniously breaking and entering his own store, for he was *Page 554 
present aiding and abetting the entry of the defendant and induced him to enter. That would of course be a legal absurdity."
In Vol. 1, Wharton's Criminal Law, sec. 190, at pp. 240-1, we find: "When a person or those officers of the law who are charged with its enforcement have reason to believe that a crime is about to be committed or attempted, there is nothing legally or morally wrong in laying a trap, setting out a decoy, or placing a detective in observation, or in entering into a conspiracy with others to detect and punish the offenders; and the waylaying and watching to detect the commission of crime by the prosecutor or witnesses, in order to obtain evidence with which to convict, will not constitute a defense, in a prosecution for the commission of the crime or offense." To sustain the text numerous authorities are cited, including theAdams case, supra. See State v. Smith, 152 N.C. 798.
In Sorrells v. U.S., 287 U.S. 435 (441-2), Chief Justice Hughes lays down this sound doctrine in law and morals: "It is clear that the evidence was sufficient to warrant a finding that the act for which defendant was prosecuted was instigated by the prohibition agent, that it was the creature of his purpose, that defendant had no previous disposition to commit it, but was an industrious, law-abiding citizen, and that the agent lured defendant, otherwise innocent, to its commission by repeated and persistent solicitation in which he succeeded by taking advantage of the sentiment aroused by reminiscences of their experiences as companions in arms in the World War. Such a gross abuse of authority given for the purpose of detecting and punishing crime, and not for the making of criminals, deserves the severest condemnation, but the question whether it precludes prosecution or affords a ground of defense, and, if so, upon what theory, has given rise to conflicting opinions. It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. (Citing numerous authorities.) The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."
We see no error in the court excluding the evidence of Hughes and others in the court below. If it had been admitted, we do not think it *Page 555 
would be a defense for the defendants. There were many robberies being committed from the Spruce Pine Store Company, Inc. Scott Hickey, an employee in the store, was approached by defendant Hughes. He wanted the combination to the safe so that he could break in the store and steal the pay roll of the Harris Clay Company, amounting to $1,200 or more, which would be in the safe on a certain day. Cannon gave Hickey a paper with a combination on it and Hickey gave it to Hughes. Hughes, instead of being enticed, tried to get Hickey, an honest employee, as the evidence discloses, to join with him in the burglary and larceny, which Hickey refused to do and reported the matter to his employer, Cannon — as he should have done. Hughes was not let in the store by any person connected with the store, but broke in and was attempting to open the safe when captured. He said: "I meant to take every dollar in the safe. My purpose in going there was to rob that safe." We think there was no violation in law or morals in catching the defendant Hughes in the manner in which it was done. Hughes admitted he burglarized the store and Vance was convicted as an aider and abetter. The exclusion of the evidence of Hughes, Hickey, and Cannon we do not think prejudicial to the defendant Vance. For the reasons given, we find in the judgment of the court below
No error.